**State of IDAHO, Plaintiff–Appellant,**

v.

**Lon T. HORIUCHI, Defendant–Appellee.**

No. 98–30149.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 20, 2000

Filed June 5, 2001

---

Stephen Yagman, Special Prosecutor for State of Idaho, on the brief and argued, Marion R. Yagman, Special Deputy Prosecutor, Joseph Reichmann, Special Deputy Prosecutor, Kathryn S. Bloomfield, Special Deputy Prosecutor, on the brief, Venice Beach CA, Ramsey Clark, Special Deputy Prosecutor, New York, NY, argued, for plaintiff-appellant.

Adam S. Hoffinger, Earl J. Silbert, Piper & Marbury, L.L.P., Washington, D.C., for defendant-appellee.

Seth Waxman, Acting United States Solicitor General, Washington, D.C., for United States of America, as amicus curiae for defendant-appellee.

George Culvahouse, O'Melveny & Myers, Washington, D.C., Griffin B. Bell, Benjamin Civiletti, William Barr, and William Webster, as amici curiae for defendant-appellee.

Before: SCHROEDER, Chief Judge, and HUG, KOZINSKI, RYMER, KLEINFELD, HAWKINS, THOMAS, SILVERMAN, GRABER, W. FLETCHER and PAEZ, Circuit Judges.

Opinion by Judge KOZINSKI; Partial Concurrence and Partial Dissent by Judge WILLIAM A. FLETCHER; Dissent by Judge MICHAEL DALY HAWKINS.

KOZINSKI, Circuit Judge:

It was, in the words of Justice Kennedy, the genius of the Founding Fathers to "split the atom of sovereignty." *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 838, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Kennedy, J., concurring). What this means in practical terms is that, within the territory of every state, two sovereigns-the state government and the federal government-reign cheek to jowl. From the dawn of the Republic, this unusual arrangement has led to a fair degree of conflict, as the actions of one sovereign have encroached on the prerogatives of the other. *See, e.g., McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). This conflict reflects, not the defects of the system, but its virtues, because the beneficiaries of these competing sovereignties are the citizens of the United States. As Alexander Hamilton foresaw:

> Power being almost always the rival of power, the general government will at times stand ready to check the usurpations of the state governments, and these will have the same disposition towards the general government.... If [the people's] rights are invaded by either, they can make use of the other as the instrument of redress.

*The Federalist* No. 28, at 181 (Alexander Hamilton) (C. Rossiter ed., 1961).

We have grown accustomed to relying on the federal government to protect our liberties against the excesses of state law enforcement. Federal prosecutors may bring criminal charges against state police who violate the rights of citizens. *See, e.g., Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Those citizens may also seek redress by bringing private suits in federal court. *See* 42 U.S.C. § 1983. While state prosecutions of federal officers are less common, they provide an avenue of redress on the flip

side of the federalism coin. When federal officers violate the Constitution, either through malice or excessive zeal, they can be held accountable for violating the state's criminal laws.

If federal agents are to perform their duties vigorously, however, they cannot be unduly constrained by fear of state prosecutions. Accordingly, the Supreme Court has held that the Supremacy Clause cloaks federal agents with immunity if they act reasonably in carrying out their responsibilities. *See In re Neagle*, 135 U.S. 1, 75, 10 S.Ct. 658, 34 L.Ed. 55 (1890). We explore the outer bounds of Supremacy Clause immunity in the context of Idaho's attempt to prosecute FBI Special Agent Lon T. Horiuchi for killing Vicki Weaver during the infamous Ruby Ridge incident.

## I

In the early morning hours of August 21, 1992, six Deputy United States Marshals, using night vision equipment and dressed in camouflage gear, conducted a reconnaissance mission on the Weaver property in preparation for serving an arrest warrant at a later date. The officers were armed but wore no visible law enforcement identification. They were still on the property at about 10:20 a.m., when they were detected by a party consisting of Kevin Harris, Randy Weaver, his son Samuel and their dog Striker. Accounts of what followed differ, but we know that a firefight erupted during the course of which the marshals killed Striker and Samuel Weaver. Samuel was shot twice, once in the arm and once, fatally, in the back. One of the Weaver party, probably Kevin Harris, shot and killed Deputy Marshal William Degan.[1] Randy Weaver and Harris retreated to the Weaver cabin. Later, Weaver and his wife retrieved Samuel's body and placed it in a structure near the cabin referred to as the birthing shed.

Special Agent Horiuchi and the other members of the FBI's Hostage Rescue Team arrived on the scene the following morning and were briefed on the situation.

---

1. Who fired the first shot, which precipitated this tragic series of events, remains a mystery. The Senate subcommittee which investigated the matter concluded as follows:

> The Subcommittee concludes that Harris shot Deputy Marshal Degan. Although we cannot conclude with certainty that [Deputy Marshal] Roderick shot the dog first, the scenario testified to by Harris does seem more plausible than the testimony of the Marshals. If the very first shot that was fired was Harris' mortal wound to Deputy Marshal Degan, Deputy Marshal Degan would have had to have fired all of his seven shots after he was mortally wounded. Although there was expert testimony at the trial that this was possible, it seems unlikely.
>
> In addition, if Deputy Marshal Degan was shot first, it is hard to understand why neither [Deputy Marshal] Cooper nor Roderick immediately shot Harris, who was standing in the Y-clearly visible-and had just shot a Deputy U.S. Marshal. Finally, once the shooting started, it seems less like-

ly that Roderick would have wasted a shot on the dog whose back was to him as the dog was walking up the hill.

> It seems plausible that a 14–year old boy, on seeing his dog shot, would have opened fire at the person who shot his dog. At that point, it was likely that the Marshals would shoot back at the two people who were firing on them. In the course of the gunfire, Marshal Degan was shot by Harris and Sammy Weaver was shot in the arm and in the back.
>
> That the first shot was Roderick's shooting of the dog is consistent with the early reports from the scene. An Idaho State Police Captain reported that he understood from talking to Roderick on the night of August 21 that he shot the dog first.

*The Federal Raid on Ruby Ridge, ID: Hearings Before the Subcomm. on Terrorism, Tech., and Gov't Info. of the Senate Comm. on the Judiciary*, 104th Cong. 1107 (1995) (Appendix, Ruby Ridge: Report of the Subcommittee) [hereinafter Ruby Ridge Report] (citations omitted).

Part of the briefing concerned the Rules of Engagement. The Rules initially authorized agents to fire at any armed adult if the shot could be taken without endangering the children in the cabin. The Rules were later revised to authorize firing only at any armed adult *male,* subject to the same caveat. The agents were forbidden from firing into the cabin because of the risk of hitting the Weaver children who were inside.[2]

Sometime during the afternoon, Agent Horiuchi and his team of snipers, guided by a deputy marshal familiar with the area, ventured on foot into the hills surrounding the Weaver cabin. The agents made their way slowly up the steep and rocky terrain and only came within view of the cabin at 5:30 p.m. Once there, the agents broke into teams of two and three along a ridge overlooking the cabin. Horiuchi, armed with a high-powered rifle and scope, took a position about 200 yards from the cabin.

At around 6 p.m., Kevin Harris, Randy Weaver and Weaver's sixteen-year-old daughter, Sara, walked out of the Weaver cabin towards the birthing shed, where Samuel's body was located. Horiuchi did not know the identities of the individuals, but he determined that at least one of them was holding a "long gun."[3] At the same time, Horiuchi says he heard the engines of the FBI helicopter in the general vicinity, although he was uncertain as to its location. According to Horiuchi, he saw the armed individual (later identified as Randy Weaver) look up to the sky as if he might fire at the helicopter.[4] Horiuchi fired once, wounding Weaver and causing him to drop from sight.

Horiuchi's shot alerted the Weavers and Harris to the presence of snipers, and they took cover behind the nearest object, the birthing shed. They remained there for ten to twenty seconds, at which point they started running back toward the cabin. Horiuchi watched through his rifle's scope as Randy and Sara Weaver ran into the cabin through a door which opened outwards, perpendicular to Horiuchi's line of sight. Harris was the last of the three to disappear behind the cabin door and, as he did, Horiuchi pulled the trigger. The bullet penetrated the glass pane of the door and eventually found its mark. Before hitting Harris, however, it struck Randy's wife, Vicki, who had been standing behind the door cradling an infant in her arms. Shot through the head, Vicki Weaver died instantly.

After investigating the incident, the Department of Justice decided not to prosecute Horiuchi. The DOJ issued a press release announcing that a case of "willfulness, or knowing, intentional use of unreasonable force cannot be made out against

**2.** The Rules present another mystery. Everyone now seems to agree that they were clearly unconstitutional. *See, e.g., Harris v. Roderick,* 126 F.3d 1189, 1205 (9th Cir.1997); Ruby Ridge Report, n. 1 *supra,* at 1111 (reporting the subcommittee's agreement with the conclusion reached by the Justice Department Task Force Report, as well as by FBI Director Louis Freeh and Deputy Attorney General Jamie Gorelick). But on the day of the shooting no one voiced any objection. And, no one now admits to having approved the Rules. *See id.* at 1112–13.

**3.** While the term "long gun" is not explained in the record, we presume it refers to a rifle or a shotgun, rather than a handgun. There is no indication that this was a long-range gun.

**4.** Horiuchi does not claim that the individual pointed the gun or put it up to his shoulder. Rather, he testified that Weaver "was carrying it in a high port carry." He explained that high port is a military term used to describe the carrying of a rifle or shotgun up near the chest with both hands.

FBI Agent Lon Horiuchi."[5] Idaho thereupon charged Horiuchi with involuntary manslaughter, in violation of Idaho Code § 18–4006(2). The complaint alleged that Horiuchi:

did unlawfully, but without malice, kill Vicki J. Weaver, a human being, in the operation of a firearm in a reckless, careless or negligent manner, to wit: discharging the firearm through the front door of the Weaver residence in an attempt to shoot Kevin Harris as he entered the door from the outside, without first determining whether any person other than his intended target was present on the other side of the door.

State Magistrate Judge Quentin Harden held a preliminary hearing and, after taking live testimony and considering transcripts from Weaver's criminal trial,[6] found sufficient evidence to support the complaint. The state then issued an information and, a week later, Horiuchi removed the case to federal district court pursuant to 28 U.S.C. § 1442(a)(1).

Once in district court, Horiuchi moved to dismiss the indictment on grounds of Supremacy Clause immunity. The district court granted Horiuchi's motion without an evidentiary hearing and Idaho appealed. A panel of this court affirmed, see 215 F.3d 986 (9th Cir.2000), and we granted Idaho's petition for rehearing en banc. See 228 F.3d 1069 (9th Cir.2000).

**II**

**A.** The Supremacy Clause of the United States Constitution, at its textual core, provides that states are bound by federal law, and nullifies any inconsistent state laws. See U.S. Const. art. VI, cl. 2. However, it became clear from the early days of the Republic that states could interfere with the operation of the federal government in ways much subtler than passing inconsistent laws. In response, the *McCulloch* Court read the Supremacy Clause broadly as prohibiting any action by the states that would interfere with the operation of the federal government. See 17 U.S. (4 Wheat.) at 427 ("It is of the very essence of supremacy, to remove all obsta-

---

**5.** The investigation was conducted by a task force of the Department of Justice's Office of Professional Responsibility (OPR), which issued a lengthy report. That report was released to the public, but later withdrawn. Nevertheless, it can still be found online. See United States Dep't of Justice, Report of the Ruby Ridge Task Force to the Office of Professional Responsibility of Investigation of Allegations of Improper Governmental Conduct in the Investigation, Apprehension and Prosecution of Randall C. Weaver and Kevin L. Harris (June 10, 1994), *available at* http://web3.foxinternet.net/djf/ruby010.htm.

The Department of Justice, apparently, did not endorse the views of the OPR Task Force, which had concluded that "[Horiuchi's] second shot violated the Constitution. We recommend that the circumstances surrounding the second shot be reviewed by the appropriate component of the Department of Justice for prosecutive merit." *Id.* Section IV.F.4.

**6.** After the standoff, Randy Weaver was charged with failing to appear and various firearms violations, all from a previous warrant, as well as murder, conspiracy to commit an offense against the United States and use of a firearm in connection with a violent crime for his actions during the initial encounter with the marshals. The jury acquitted him of all charges except failure to appear. *Weaver v. United States*, 37 F.3d 1411, 1412 (9th Cir.1994).

Both Harris and the Weavers subsequently brought civil suits against the agents involved in the standoff and their superiors. The Weaver family settled its suit for $3.1 million. See Betsy Z. Russell, *FBI Sniper Still Faces Idaho Trial*, Spokesman Rev. (Spokane), Sept. 15, 1999, at B3. After we held that the agents, including Horiuchi, were not entitled to qualified immunity, *see Harris*, 126 F.3d 1189, the government settled with Harris for $380,000. See *U.S. Settles With Man Injured at Ruby Ridge*, L.A. Times, Sept. 24, 2000, at A15.

cles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence."). Over the years, the federal courts have been vigilant in protecting the federal government from interference by the states in many areas of its operations. *See, e.g., Crosby v. National Foreign Trade Council*, 530 U.S. 363, 120 S.Ct. 2288, 2290–91, 147 L.Ed.2d 352 (2000) (foreign relations); *Ridgway v. Ridgway*, 454 U.S. 46, 54, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981) (insurance); *Bryan v. Itasca County*, 426 U.S. 373, 376–77, 376 n. 2, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (relations with Indian tribes).

One potential area of tension is law enforcement, where the states and the federal government sometimes have concurrent jurisdiction. When federal law enforcement agents carry out their responsibilities, they can cause destruction of property, loss of freedom and, as in this case, loss of life-all which might violate the state's criminal laws. More than a century ago, in *Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55, the Supreme Court recognized the Supremacy Clause as a source of protection for federal agents facing state criminal charges for actions taken in the course of their duties. In that case, the Court held that a Deputy United States Marshal was immune from state prosecution for killing a man he suspected was about to stab Justice Field.[7]

The question that commanded the Court's attention in *Neagle* was whether the deputy marshal was authorized to protect Justice Field even though "[no] special act of Congress exists which authorizes the marshals or deputy marshals of the United States in express terms to accompany the judges of the Supreme Court through their circuits, and act as a body-guard to them." *Id.* at 58, 10 S.Ct. 658. The Court concluded that Neagle did have such authority and found it appropriate to "extend in a liberal manner the benefit of the writ of *habeas corpus* to persons imprisoned for the performance of their duty." *Id.*

*Neagle* addressed only whether the deputy marshal acted in a way that was generally authorized by federal law. Though Deputy Marshal Neagle killed a man who did not pose a deadly threat to Justice Field, *see* n. 7 *supra*, the Supreme Court appeared convinced that Neagle acted reasonably in light of what he knew. *See Neagle*, 135 U.S. at 53–54, 10 S.Ct. 658. *Neagle* therefore had no occasion to address the more difficult question of whether a federal agent will lose his immunity if he carries out his responsibilities in an unreasonable manner.

The Court answered this question sixteen years later in the case of two soldiers who were charged in state court with the murder of a civilian. *See United States ex rel. Drury v. Lewis*, 200 U.S. 1, 26 S.Ct. 229, 50 L.Ed. 343 (1906). The soldiers claimed the civilian was fleeing arrest when they shot him,[8] but witnesses testified that he was shot after he had surrendered. The Court noted that shooting a suspect after he surrenders was unlawful and so, if the allegations were true, the officers could not claim they were reasonably discharging their duties under federal law. *See id.* at 8, 26 S.Ct. 229. Because the soldiers may have acted unlawfully, depending on whose testimony was be-

---

**7.** The deputy turned out to be mistaken; the suspect was unarmed. *See Neagle*, 135 U.S. at 53, 10 S.Ct. 658.

**8.** At the time, killing a fleeing suspect was lawful. *See Drury*, 200 U.S. at 8, 26 S.Ct.

229. The law has changed in this regard, so that killing a fleeing suspect is legal only in limited circumstances. *See* p. 367 *infra*.

lieved, the Court held that the state could prosecute them for murder.

■ *Drury* squarely holds that a state may prosecute federal agents if they have acted unlawfully in carrying out their duties.[9] Cases since *Drury* have refined the standard applicable to the immunity inquiry. To be immune from state prosecution, "a federal officer [must do] no more than is necessary and proper in the performance of his duty." *Clifton v. Cox,* 549 F.2d 722, 730 (9th Cir.1977). For an agent's actions to be adjudged necessary and proper, he must show " 'that he had an honest and reasonable belief that what he did was necessary in the performance of

his duty.' " *Id.* at 729 (emphasis omitted) (quoting *In re McShane,* 235 F.Supp. 262, 274 (N.D.Miss.1964)); *see also Whitehead v. Senkowski,* 943 F.2d 230, 234 (2d Cir. 1991) (Supremacy Clause immunity applies if the agent shows he "reasonably believed that his actions were necessary to perform that job and had no motive other than to do his job" (citation omitted)); *Kentucky v. Long,* 837 F.2d 727, 745 (6th Cir.1988) ("the agent must have an honest belief that his action was justified" and "his belief must be reasonable").[10] Federal agents will be immune from state prosecution if they acted in an objectively reasonable manner in carrying out their duties.[11]

---

**9.** *Drury* actually holds more than this: Even if it is *not* clear that the federal agents acted unlawfully, the state may proceed with the prosecution if it has evidence which, if believed, would render the federal agents' conduct unlawful. *See Drury,* 200 U.S. at 8, 26 S.Ct. 229 ("[T]here was a conflict of evidence as to whether Crowley had or had not surrendered, and it is conceded that if he had, it could not reasonably be claimed that the fatal shot was fired in the performance of a duty imposed by the Federal law, and the state court had jurisdiction.").

**10.** The dissent reads previous Supremacy Clause immunity cases as suggesting that so long as an officer is not on a "frolic and detour," courts may only deny the immunity claim where the officer acted with malice or other criminal intent. *See* Diss. Op. at 389. We are obviously not free to add a "malice" requirement where the Supreme Court has not done so, nor would such an addition be warranted. There are, of course, numerous ways a federal officer might abuse his authority, without exhibiting a bad intent. For instance, an agent may not torture a kidnapper to reveal the whereabouts of his victim, even though he believes it necessary to perform his job. Closer to home, an officer may not raise a Nuremberg Defense and claim that he shot a suspect who posed no threat because he believed his duty required him to follow orders.

The dissent suggests that denying immunity where the officer acted in the scope of his

official duties and without deliberate malice would be unprecedented. *See* Diss. Op. at 389. What's unprecedented about this case is that the taking of human life was pre-planned. Deputy Marshal Neagle wasn't ordered to kill David Terry; he fired only after Terry assaulted Justice Field and after issuing a warning. *See Neagle,* 135 U.S. at 52–53, 10 S.Ct. 658. Agent Clifton wasn't executing a plan when he shot the fleeing suspect. *Clifton,* 549 F.2d at 724. Nor was Cyrus Gillette. *United States v. Lipsett,* 156 F. 65, 65–66 (W.D.Mich. 1907). In contrast, Horiuchi commanded his squad under orders to shoot any armed males he saw, regardless of whether they posed any danger. He testified that the issue of danger had already been decided by his superiors before his men ascended the hill. Horiuchi instructed his men to wait until a number of suspects had emerged from the cabin so that they could be sure to shoot several at the same time. *See* p. 370 *infra.* Unlike the dissent, we do not see these differences from past cases as cutting in Horiuchi's favor.

**11.** Supremacy Clause immunity cases hold that the test is both objective and subjective: The officer is denied immunity unless he demonstrates that he believed both reasonably *and* honestly that his conduct was lawful. However, none of these cases consider the impact of *Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), which rejected the subjective prong for the qualified immunity defense and held that immunity requires only a showing that

**B.** The use of deadly force to apprehend a suspect is a seizure under the Fourth Amendment. *See Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Law enforcement agents may use deadly force only if they reasonably believe that killing a suspect is necessary to prevent him from causing immediate physical harm to the agents or others, or to keep him from escaping to an area where he is likely to cause physical harm in the future. Even then, deadly force may not be deployed until the suspect has been given a warning and an opportunity to surrender, unless giving a warning will materially increase the risk of bodily injury or escape. *See id.* at 11–12, 105 S.Ct. 1694.

We applied this standard in *Forrett v. Richardson*, 112 F.3d 416 (9th Cir.1997), where we upheld the police shooting of a fleeing suspect. Forrett had committed a vicious assault during a home invasion robbery, was identified by police with reasonable certainty, was known to be armed and had been running loose in a densely populated area for almost an hour. *See id.* at 420–21. We held that the shooting was justified because the police reasonably feared that Forrett "would seize an opportunity to take an innocent bystander hostage." *Id.* at 421. Forrett was also given a chance to surrender: "The officers approached to within 20–30 feet and shouted at Forrett to stop and surrender," but he refused. *Id.* at 418. Under *Garner*, as applied in *Forrett*, an officer may respond with deadly force to the attenuated threat presented by a fleeing suspect only if two conditions are met. First, there must be reasonable cause to believe that the suspect is dangerous and will escape to a location where he will be able to cause physical harm to others. And, second, the officers must identify themselves and give the suspect a chance to surrender, unless giving the warning would itself risk serious harm to the officers or to members of the public, or materially increase the likelihood of escape.

**C.** Horiuchi raised his Supremacy Clause immunity defense by way of a motion to dismiss; while he submitted a variety of materials in support of his motion-including transcripts of prior proceedings-the court held no evidentiary hearing.[12] In such circumstances, the district court may grant the motion only if the facts supporting the immunity claim are not in dispute. *See, e.g., Long*, 837 F.2d at 752 (the court will not grant the motion where the evidence "raise[s] a genuine factual issue whether the federal officer was acting pursuant to the laws of the United States and was doing no more than what was necessary and proper for him to do" (emphasis omitted)); *cf. Morgan v. California*, 743 F.2d 728, 732 (9th Cir.1984) ("[A] grant of a writ of habeas corpus prior to a state criminal trial is inappropriate when there are material factual disputes" over the claim of Supremacy Clause immunity.). In determining whether material facts are in dispute, the district court must give the non-moving party the benefit of all doubts, both as to the basic facts and the inferences to be drawn from those facts. *See, e.g., United States v. Jensen*,

---

the conduct was objectively reasonable. *Harlow*'s reasoning would seem to apply equally to Supremacy Clause immunity. Because it makes no difference on this appeal, we leave the issue for consideration where it matters.

**12.** Horiuchi requested an evidentiary hearing, but the district court concluded that the factual record was complete and so the immunity question might be decided as a matter of law. The State of Idaho argued that an evidentiary hearing was unnecessary under the (mistaken) belief that factual disputes could only be resolved by the jury. *See* Part IV *infra*. Of course, as the nonmoving party, the State had no obligation to seek an evidentiary hearing.

93 F.3d 667, 669 (9th Cir.1996); *Jensen v. City of Oxnard,* 145 F.3d 1078, 1082 (9th Cir.1998).

## III

■ Horiuchi claims he acted reasonably in trying to kill Harris in order to keep him from harming the law enforcement agents on the scene, specifically those in the helicopter.[13] He points to his initial briefing, which depicted Randy Weaver as a Rambo-like figure, commanding an unknown number of heavily armed white separatists who had fired indiscriminately at the deputy marshals the previous day, killing Deputy Marshal Degan. *See* Excerpt of Testimony of Lon T. Horiuchi at 198, *United States v. Weaver,* No. 92–080–N–EJL (D. Idaho June 3, 1993) [hereinafter Horiuchi Testimony].[14] At Weaver's criminal trial, Horiuchi also testified that he saw three individuals step out of the cabin, at least one of them armed with a long gun; at the same time, he heard the FBI helicopter in the area. Horiuchi saw the man with the long gun (Weaver) make a threatening gesture towards the helicopter. *See id.* at 87–90. Responding to this threat, Horiuchi took aim and fired once, striking Weaver in the shoulder. Based on what he saw of Weaver's reaction, Horiuchi believed he had missed. *See id.* at 91. Ten to twenty seconds later, Horiuchi observed the same three individuals running toward the door of the cabin, which stood open outwards, perpendicular to Horiuchi's line of sight. One of the men (Harris) was carrying a gun, and Horiuchi believed it

was the same man he had seen threatening the helicopter. Without first calling out a warning, Horiuchi shot Harris; he did so in order to keep him from reaching the safety of the cabin, from where he could shoot at the helicopter or escape. Horiuchi did not see Mrs. Weaver standing behind the door, nor was he aware that she had stepped out of the cabin. Were we to accept Horiuchi's story at face value, as the dissent does, we too would conclude that he was entitled to immunity. However, Horiuchi's explanation hinges on a series of explicit or implicit factual assertions, and we cannot accept the explanation unless we find that the underlying assertions are established beyond dispute. Broken into its constituent parts, Horiuchi's explanation consists of six key factual elements:

1. Horiuchi heard the FBI helicopter and believed that it was positioned so that it could be brought down by rifle fire from the Weaver cabin.

2. Horiuchi shot Harris, and by extension Mrs. Weaver, in order to eliminate an imminent risk to the helicopter and not because he was following the Rules of Engagement.

3. Horiuchi had reasonable cause to believe that giving a warning and opportunity to surrender before taking the second shot would have been futile or dangerous.

4. At the time Horiuchi shot Harris, he believed him to be the same man who had made threatening gestures at the helicopter 10 to 20 seconds earlier.

---

**13.** While Horiuchi's second shot was aimed at Harris, it killed Vicki Weaver, and it is with that killing that Horiuchi is being charged. In resolving the question of immunity, we consider only whether Horiuchi was justified in trying to kill Harris. Horiuchi's criminal responsibility, if any, for killing Mrs. Weaver is a matter of state law to be determined by a jury after trial.

**14.** While this description of the August 21 incident is a material exaggeration, *see* pp. 362–63 *supra,* there is no dispute that this is what Horiuchi was told. Because Horiuchi was entitled to rely on information given to him by his superiors, we accept this description for purposes of determining whether Horiuchi acted reasonably.

5. Horiuchi did not know, and had no reason to believe, that Mrs. Weaver (or some other person) was standing behind the cabin door at the time he shot at Harris through the door.

6. Horiuchi had reason to believe that, once the armed man reached the safety of the cabin, he would be able to escape and cause harm to others.

We consider which, if any, of these components of Horiuchi's story were established beyond doubt.[15]

**1. The location of the helicopter.** We start with Horiuchi's own statements about the helicopter. In his testimony at Weaver's trial, Horiuchi admits that he never actually saw the helicopter, and he gave inconsistent answers about where he believed it was. On direct examination, Horiuchi testified that the helicopter was behind him. *See* Horiuchi Testimony, p. 368 *supra*, at 83 (Weaver "looked up at the helicopter or what I perceived to be a helicopter *somewhere behind my location.*" (emphasis added)). But Horiuchi's first shot hit Weaver in the back. On cross-examination, Horiuchi was asked, if Weav-

er was looking at a helicopter that was hovering *behind* Horiuchi, then Weaver would have been facing him; how then could Horiuchi have shot Weaver in the back? At this point, Horiuchi backpedaled and said that he didn't know where the helicopter was, and "I would be guessing if I told you where it was." *Id.* at 259. But if Horiuchi did not see the helicopter and did not know where it was, it is difficult to conclude that a reasonable agent in his position would have believed it to be in danger.[16]

And, indeed, neither Horiuchi nor any of the other agents on the scene reacted as if they thought the helicopter was in danger. The agents on the ridge were in radio contact with the FBI command center and were reporting significant developments. Thus, when the three individuals strayed outside the cabin, one of the agents promptly reported it. *See id.* at 77 ("I believe it was Special Agent Love in Sierra 1 position who saw them coming out at the same time, pretty much the same time I did, and he radioed back to the command

---

**15.** The dissent recognizes that "Idaho argued strenuously in the district court that there were multiple disputed issues of material fact," but would forbid us from considering factual disputes that it claims were not raised in the State's opposition papers. Diss. Op. at 391–92. Yet the very case the dissent relies on in support, *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026 (9th Cir.2001), held that in considering whether factual disputes preclude summary judgment, the district court "has discretion in appropriate circumstances to consider other materials" in the record, although "it need not do so." *Id.* at 1031. Of course, we conduct de novo review, so we have exactly the same discretion as the district court. In a case as unusual as this one, where the procedural boundaries are so unclear, it seems particularly appropriate to exercise that discretion-if necessary.

The dissent also makes much of a remark made by the author of this opinion in dissent-

ing to the original panel decision; it's so important it's quoted twice. *See* Diss. Op. at 380 n. 1, 390. As Justice Frankfurter observed, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat'l Bank & Trust Co.*, 335 U.S. 595, 600, 69 S.Ct. 290, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting).

**16.** Randy Weaver testified before the Senate Subcommittee that at the time of the shooting, there was no helicopter in the area at all. He said "all was quiet," and "had they heard a helicopter at this moment, they all would have run back to the cabin immediately." Ruby Ridge Report, n. 1 *supra*, at 1115. This congressional testimony, of which we may arguably take judicial notice, suggests additional uncertainty about the location of the helicopter-that it may not even have been in the area at the time of the shooting.

post that three individuals had come out of the building."). If Horiuchi and the other agents thought the helicopter was in danger from the man with the long gun, one would have expected them to warn the pilot to move out of rifle range. Assuming there had been no time to do so before the first shot, there would have been ample time afterwards, when Horiuchi thought his bullet had missed, leaving the man with the long gun at large and presumably still dangerous.[17]

There is other evidence that a reasonable officer in Horiuchi's position would not have believed that the helicopter was within rifle range of the cabin. This was not an aircraft piloted by a civilian who might have stumbled into the danger zone; Horiuchi knew that the FBI pilot was aware of the danger and was taking appropriate precautions. Earlier that day, Horiuchi had been aboard on a reconnaissance mission and noted that the pilot "popped over the hill low and then came back over" so as not to present a clear target to the armed and presumably dangerous people in the Weaver cabin. *Id.* at 191. Horiuchi first testified that during his flight, the helicopter "wasn't necessarily well out of rifle range" of the cabin. *Id.* at 258. But he was impeached by his prior testimony, where he had stated unequivocally, "[w]e stayed well out of range of the cabin during the flight." *Id.* Horiuchi also knew that the helicopter had taken several other flights over the area, all without incident. By returning to the cabin, the two men and the young girl restored the situation to precisely where it had been before they exited.

Finally, Horiuchi himself admitted that he did *not* fire the second shot because he believed the man with the long gun would pose a threat to the helicopter if he reached the safety of the cabin. At the Weaver criminal trial, Horiuchi testified that he decided to kill the man as soon as he saw him looking menacingly at the helicopter, and did not reconsider this decision before taking the second shot: "I had already made that determination after that first shot, so if I saw him again[,] I was going to shoot at that individual again." *Id.* at 107.[18] If accepted at face value, this statement suggests that Horiuchi had decided to shoot the man with the gun, whether or not he continued to be a threat to the helicopter.

On this record, it seems highly debatable whether a reasonable agent in Horiuchi's position would have believed that the helicopter would be endangered if the man with the gun reached the cabin.

**2. The Rules of Engagement.** There is also doubt about whether Horiuchi is making up the helicopter story to cover up his real reason for the shooting, which was

---

17. Had any of the agents thought that the helicopter could be shot from the cabin, they would probably have called in a warning even if they thought Horiuchi *had* killed the man with the long gun. After all, Horiuchi and the other agents had been told that there were numerous people with guns in the cabin, *see* p. 368 *supra*, and so killing one of them would not have eliminated the danger. It seems highly unlikely that a squad of FBI agents would observe an FBI helicopter in danger of being shot down, yet none of them would warn it to get out of harm's way.

18. Of course, a law enforcement officer must justify *every* use of deadly force as necessary and proper; he may not keep pulling the trigger, regardless of changed circumstances. We confronted precisely this situation in *Hopkins v. Andaya*, 958 F.2d 881, 887 (9th Cir. 1992), where the officer kept shooting after the suspect ceased being dangerous. We rejected the officer's claim of qualified immunity, holding that the justification for the use of deadly force does not continue indefinitely. If circumstances change, and the danger abates, it will be unreasonable to continue using deadly force.

to follow the orders he had been given to shoot any armed man on sight. Horiuchi testified that he believed he had the authority to shoot an armed man without making any judgment about the existence of an immediate threat. "[T]he decision that we were already in danger had already been made for us prior to going up the hill." *Id.* at 159. When asked on cross whether he intended to shoot the men "irrespective of a threat," he replied, "[b]ased on the Rules of Engagement, sir, we could." *Id.* at 264.

Horiuchi, as leader of the sniper team, instructed his men about how they should carry out their mission. His instructions did not reflect our constitutional rules as to the use of deadly force–such as shooting only in case of a threat. Rather, Horiuchi's instructions closely mirrored the Rules of Engagement:

> I said what we wanted to do was to try and get as many people, both of the subjects out before we take the shot. In other words, if only one subject had come out [of the cabin], we were going to pretty much wait maybe wait a minute, 30 seconds, maybe more before anyone took the shot to try and eliminate having taken one shot and then the rest of them pretty much all inside. We wanted them all outside if we were going to shoot the two subjects.

*Id.* at 203–04.

Horiuchi also described his decisions at the scene in terms of the Rules of Engagement, rather than any independent assessment of a threat. Soon after he reached his position, he watched Sara Weaver exit, move towards the shed and then return to the cabin. He testified that he didn't shoot her because "the female was not armed at that time, and I was assuming she was a child because of the size of the stature." *Id.* at 62. A few minutes later, Horiuchi saw a man come out on the back porch. He decided against shooting him because "[t]he individual did not appear to be armed, there was nothing in his hand, and I did not see any weapons around or on his person." *Id.* at 64–65. Horiuchi did *not* testify that he decided against shooting because these individuals posed no threat. Instead, he focused on their age and sex, as well as the absence of weapons, precisely as specified in the Rules of Engagement, which directed him to shoot only at armed men. This is also consistent with the fact that, as soon as he had a clean shot at an armed man, Horiuchi aimed and fired.

This evidence suggests that Horiuchi shot Harris because he was following the unconstitutional Rules of Engagement, not because he thought Harris would pose a danger to the helicopter if he reached the cabin.[19] If a trier of fact finds that Horiuchi lied about his motives, this would undermine other portions of his story as well, such as his description of the location and vulnerability of the helicopter.[20]

---

**19.** The Senate Subcommittee that investigated the same matter shared our concerns: "[T]here is a reasonable basis to conclude that the Rules of Engagement, more than any fear for the safety of the helicopter, prompted Horiuchi to take the first shot." Ruby Ridge Report, n. 1 *supra*, at 1118.

**20.** The dissent contends that Idaho is foreclosed from arguing that Horiuchi followed the Rules of Engagement because the criminal complaint charges him with involuntary manslaughter, not murder. *See* Diss. Op. at 394 ("[T]hat argument is squarely foreclosed by the criminal complaint. If such conduct was the factual predicate of the complaint, Horiuchi should have been charged with murder."). But the State has no obligation to bring the maximum charges supported by the evidence, nor does its decision to charge manslaughter preclude it from presenting evidence that might also support a murder charge. Horiuchi obviously cannot defend against a manslaughter charge by taking the

### 3. Would a warning have been futile or dangerous?

Giving a warning is a condition on the use of deadly force, *except* in those rare circumstances where doing so would materially increase the danger to law enforcement personnel or bystanders. *See Garner*, 471 U.S. at 11–12, 105 S.Ct. 1694 ("deadly force may be used if necessary ... if, where feasible, some warning has been given"). This contemplates a narrow class of cases, such as where the suspect has opened fire, or pointed a gun at vulnerable targets.[21]

The FBI had been in the area for a full day, and had deployed snipers to within 200 yards of the cabin, yet the occupants were never alerted or warned to surrender. The first they learned that they were under siege was when Horiuchi's bullet struck Randy Weaver. Had Horiuchi identified himself as a law enforcement officer and ordered them to surrender, it is entirely possible they would have come out with their hands in the air, and the tragedy could have been averted. But when the two men and young girl found themselves the targets of an unseen, unidentified sniper, what were they to do? Not hearing the kind of warning and surrender demand one has come to expect from law enforcement officers, they could not be sure who was shooting at them, or that a surrender would be accepted. By failing to give a warning, Horiuchi left Harris and the Weavers no option except to fight or flee, escalating an already dangerous situation. Having used deadly force without a warning, Horiuchi is only entitled to immunity if he could have reasonably believed that giving a warning in this case would be futile or dangerous. To prevail on the motion to dismiss, he has to show that there is no material dispute on this point.[22]

Assuming that Horiuchi reasonably believed Weaver was about to shoot at the helicopter, he would have been entitled to take his first shot without giving a warning because the danger appeared to be direct and immediate. But after that first shot, neither Harris nor Randy Weaver nor anyone else connected with the cabin was shooting or aiming weapons at any vulnerable targets. At first they were hiding, for a period of up to twenty seconds, then they were running, giving Horiuchi ample time to shout a surrender demand.[23] It is pos-

---

stand and swearing he acted maliciously. Thus, the state criminal complaint has no bearing on whether disputed material facts prevent Horiuchi from establishing federal immunity as a matter of law.

21. The warning requirement ensures that law enforcement agents only employ deadly force as a last resort. If the suspects fail to surrender after police make their presence known and assert their lawful authority, this makes it reasonable to believe the suspects plan to flee or fight. But when no warning is given, and the suspects don't know they are under police surveillance, failing to surrender cannot automatically be construed as a threat. Of course, police sometimes run into situations where the danger is so obvious and severe that giving a warning is superfluous or even dangerous; in that situation, deadly force may be used even without a warning.

22. In *Harris v. Roderick*, 126 F.3d 1189 (9th Cir.1997), we reviewed the facts surrounding Agent Horiuchi's shooting in order to determine if he was entitled to qualified immunity. *Id.* at 1192–94. In holding that Horiuchi was not entitled to such immunity, the opinion focused, in part, on the absence of any warning: "Horiuchi gave him no warning and no opportunity to surrender or to otherwise cease his resistance to the exercise of lawful authority." *Id.* at 1203.

23. Horiuchi testified that he was near enough to hear voices from inside the cabin, *see* Horiuchi Testimony, p. 368 *supra*, at 13 (testifying that the agents heard "screaming, a single male voice" from their positions). A shouted warning from one or more of the agents would therefore have been audible to the three as they were hiding behind the birthing shed.

sible that giving a warning at that point would have been futile or dangerous, but Horiuchi has presented no factual basis for so concluding. At the very least, the point is in dispute. *Accord Harris*, 126 F.3d at 1203. On the evidence before us, we cannot hold that Horiuchi has established that he reasonably believed giving a warning, as required by *Garner*, was not feasible.

**4. Was Horiuchi reasonably sure of his target?** Even if Horiuchi's story about his concern for the helicopter is believed, it still does not explain why he shot Harris rather than Randy Weaver. After all, Horiuchi only observed one of the two men holding a rifle and making menacing gestures toward the helicopter. This observation might have justified shooting that man, certainly not the other one. Knowingly shooting the man who did not threaten the helicopter, just because he was armed and in the vicinity, would not have been constitutionally permissible. Indeed, Horiuchi does not attempt to justify shooting Harris on this basis. Rather, he claims that he made a mistake-that he shot Harris when he meant to shoot Weaver.

Horiuchi, once again, contradicts himself. During the Weaver criminal trial, he testified that the two men were dressed in similar black clothing and he could not tell them apart. *See* Horiuchi Testimony, p. 368 *supra*, at 238–39. If this testimony is credited, then Horiuchi would have had no cause to believe that Weaver was the second man running into the cabin, rather than the first. At most, it would establish that Horiuchi thought there was a $^{50}\!/_{50}$ chance the man he was shooting was the one he had seen threatening the helicopter. This is far less certainty than an officer must have before taking human life.

Before using deadly force, the officer must be reasonably certain that his target is, indeed, the one who is posing the threat. If Horiuchi was unable to tell the two men apart, as his testimony suggests, then he could not be reasonably certain of his target and he had no justification for taking the second shot. Pulling the trigger based on a fifty-percent probability of killing the wrong person does not fall into the realm of the reasonable.

Given the current record, we have no way of ascertaining what factual basis Horiuchi had for believing, to a reasonable certainty, that he was shooting the man he had observed looking menacingly at the helicopter. As best the record discloses, this was not a case of mistaking one man for the other, but of shooting in the face of major uncertainty about the identity of the target. This is more akin to recklessness than reasonable conduct.

**5. The position of Vicki Weaver.** Horiuchi claims he was unaware that Mrs. Weaver was standing behind the door when he shot through it at Harris. Yet again, Horiuchi's testimony on this point has been less than consistent. Horiuchi testified that, when he fired at Harris, he thought someone else might be standing behind the door, because Harris "was trying to hold the door open or moving somebody out of the way." *Id.* at 108. Other witnesses, too, contradict Horiuchi's claim. Sara Weaver testified that the curtain on the door was open, *see* Preliminary Hearing Testimony at 21, and so Horiuchi could have seen her mother through the glass pane on the door. Both Sara and Randy Weaver testified that, after the first shot, Vicki Weaver came onto the porch and called out, and so Horiuchi could have seen or heard her. *See id.* at 10, 92. Of course, there is evidence that supports Horiuchi's version as well. But there remain disputed facts on this issue. If Horiuchi shot through the door knowing, or having reason to believe, someone else was standing behind it, then his second shot could not be deemed reasonable.

**6. The danger of escape.** At oral argument before us, Horiuchi's lawyer suggested that the armed man could have fled out the back door of the cabin and made his way to a populated area. We have examined the record and find no support for this contention. This was not a situation, as in *Forrett,* where the use of deadly force was justified by the need to avert danger to the public from a fleeing suspect. Forrett was loose in a residential neighborhood where he could have taken a hostage at any time. By contrast, Harris was running toward a cabin in the middle of nowhere, and the cabin itself was under siege by nine federal agents armed with M–16 rifles, and with backup that included a helicopter, an armored personnel carrier and a gun-toting robot. So far as the record discloses, there was no material risk that he would make his way to a populated area where he could harm somebody or take hostages.[24] On the record before us, we cannot say that a reasonable agent in Horiuchi's position would have concluded that Harris presented the kind of immediate danger that made the use of deadly force reasonable. At the very least, the matter is in dispute.

## IV

■ Because we find that there are material questions of fact in dispute which, if resolved against Horiuchi would strip him of Supremacy Clause immunity, we must reverse the district court's order dismissing the case. The question remains: What next? Presuming that Horiuchi wishes to press his immunity claim, a trier of fact will have to resolve these factual issues. Will this be the district judge, hearing the matter on a renewed motion to dismiss, or the jury during the course of the trial?

While there is practically no law, and very little guidance, we conclude that if Horiuchi renews his motion to dismiss, factual issues must be resolved by the district court prior to trial; and if there continues to be conflicting evidence pertaining to key aspects of Horiuchi's immunity claim, as we expect there will be, the factual disputes must be resolved by the district court.

The only case to speak directly to this issue comes from the early part of the last century. In *West Virginia v. Laing,* 133 F. 887, 891 (4th Cir.1904), the court concluded that "Congress certainly intended, in cases of this character, that the judges of the United States should hear the evidence, and without a jury proceed in a summary way to pass upon the federal question involved."[25] *But cf. United States v. Lipsett,* 156 F. 65, 71 (W.D.Mich.

**24.** Horiuchi testified that he was able to see and shoot any person who left the cabin by the back door. Horiuchi had already seen a man walk on to the back deck; he stated that he could have shot the man but decided against it because the man was unarmed. *See* Horiuchi Testimony, p. 368 *supra,* at 63–65. Thus, if anyone tried to escape through the back door, Horiuchi would have been able to shoot him.

The dissent goes even farther than Horiuchi's counsel, suggesting that the man in the cabin might have escaped through a window, or through some undefined opening on the other side of the cabin. *See* Diss. Op. at 397.

The dissent makes this statement based entirely on Horiuchi's statement that the cabin was not surrounded. Nothing in the record addresses what Horiuchi knew or didn't know about any potential escape routes; the dissent can only reach its conclusion by drawing inferences in favor of Horiuchi, something plainly inappropriate on a motion to dismiss.

**25.** The only other case of which we are aware is more in the nature of legal lore than precedent. Following the fabled shootout at the O.K. Corral, in Tombstone, Arizona, Deputy Marshal Virgil Earp, and his deputized brothers Wyatt and Morgan, along with J.H. "Doc" Holliday, were charged with murder. A

1907) (suggesting that had there been facts in dispute, the court would let the state jury decide them).[26]

We also find persuasive modern courts' practice of deciding factual questions underlying criminal immunity claims, rather than submitting them to juries. Having to live through the anxiety of a criminal trial destroys most of the benefits of immunity, and so courts often dispose of factual questions underlying immunity defenses prior to allowing the jury to deliberate on criminal liability. We have recognized that courts may decide the facts underlying a double jeopardy claim or the scope of an immunity deal with the prosecution. *See, e.g., United States v. Mendoza,* 78 F.3d 460, 464–65 (9th Cir.1996) (immunity deal); *United States v. Gutierrez–Zamarano,* 23 F.3d 235, 237 (9th Cir.1994) (double jeopardy). A defendant, such as Oliver North, who was given a grant of immunity, is entitled to a *Kastigar* hearing, where the district court makes determinations about whether the government has made its case based on immunized testimony. *See Kastigar v. United States,* 406 U.S. 441, 461, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *United States v. North,* 920 F.2d 940, 941–42 (D.C.Cir.1990) (per curiam). And, of course, courts routinely decide any factual disputes underlying attorney-client privilege, executive privilege, probable cause and other evidentiary matters.

We recognize that none of these provides a perfect analogy because a claim of Supremacy Clause immunity is much more central to the subject matter of the criminal case than, for example, a claim of double jeopardy. Nevertheless, we find significant policy reasons supporting our decision. To begin with, the question of Supremacy Clause immunity, while very similar to the issues presented in the criminal case, is nevertheless quite distinct. While the jury must decide the case under state law, Supremacy Clause immunity is a matter of federal law. The state standard for justification may or may not be the same as the federal standard, and asking the jury to apply two similar-yet distinct-legal standards to the same set of facts can only lead to confusion.[27] By contrast, fed-

---

month-long evidentiary hearing was held before a Territorial Justice of the Peace, who dismissed the prosecution on the ground that Virgil Earp and his deputies reasonably carried out their duty as law enforcement officers:

> In view of all the facts and circumstances of the case, considering the threats made, the character and positions of the parties, and the tragic results accomplished in manner and form as they were, with all the surrounding influences bearing upon the res gestae of the affair, I cannot resist the conclusion that the defendants were fully justified in committing these homicides-that it [was] a necessary act, done in the discharge of an official duty.

Steven Lubet, *The Forgotten Trial of Wyatt Earp,* 72 U. Colo. L.Rev. 1 (2001) (quoting Judge Wells Spicer) (alteration in original). While clearly not binding on us, the Earp case does support the notion that disputed facts concerning a law enforcement officer's claim that he was acting within the scope of his duty should be resolved by the court before the officer is exposed to the expense, risk and personal apprehension of a criminal trial.

**26.** The force of *Lipsett*'s statement is somewhat in doubt because this was a state habeas case, and all the district judge could do is grant or deny the habeas petition. Had he denied the petition, the district judge could not decide whether the state court would submit the question to a jury or decide it for itself. *Lipsett*'s statement about sending the case to a state jury is probably best read as hyperbole.

**27.** Even if the district court decides against immunity, the officer may argue before the criminal jury that his conduct was justified under state law. For instance, under Idaho law, a homicide is justified when it is "necessarily committed in attempting, by lawful ways and means, to apprehend any person for

eral judges, versed in the subtleties of federal immunity law, are well equipped to make factual findings and legal conclusions. These rulings can then be reviewed on appeal much more easily than a jury verdict which, after all, is almost entirely opaque.

Perhaps most significant, however, is the fact that having the district court hear the evidence and make factual findings before the state prosecution can go forward will act as a substantial safeguard against frivolous or vindictive criminal charges by states against federal officers. As experience with qualified immunity cases shows, if merely presenting a disputed issue of fact were sufficient to get to a jury, then state prosecutions of federal agents could become quite common. Such prosecutions-whether successful or not-place a heavy burden on the agent charged and the agency that employs him.

It's true that, in the civil context, we have held that the disputed factual issues underlying the immunity defense must be put to the jury. *See, e.g., Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir.1993). But criminal liability threatens the officer personally in a way that civil liability does not and so calls for a more cautious approach. In the civil context, the government agency may indemnify an officer against suits, and agencies regularly do so. *See, e.g.,* John C. Jeffries, Jr., *In Praise of the Eleventh Amendment and Section 1983*, 84 Va. L.Rev. 47, 50 & n. 16 (1998). Thus, the principal aim of civil suits is not to punish the officers as much as it is to force law enforcement agencies to internalize social costs imposed by its officers, so that the agency will weigh those costs against the benefits it seeks to achieve. In other words, civil damages

against law enforcement officers are as much about enterprise accountability, as they are about personal blame.

Criminal liability is quite another matter. The sanction is more severe, and the law enforcement agency cannot pay it. The agency can't serve prison time for the officer; nor can it restore voting or other civil rights, or make up for the shame that results from a criminal conviction. Because an employing agency cannot protect the officer from criminal punishment, criminal liability (unlike civil damages) is not fundamentally about enterprise liability and internalizing costs; rather, it is fundamentally about personal blame and accountability.

Because the criminal sanction weighs entirely on the officer, rather than on the agency, we believe that the procedures we follow in the civil context will not sufficiently protect officers from the risk of state criminal prosecution. For this reason, as well as those stated above, we believe interposing a federal judge between the state prosecutor and the jury will provide a significant restraint on overzealous state prosecutors and ensure such prosecutions remain an avenue of last resort in our federal system.

### V

The United States, as amicus curiae, cautions that subjecting federal agents to the criminal laws of the various states could chill their ability to carry out vital duties, such as guarding the President. But Supremacy Clause immunity is not absolute and so presupposes that federal agents can be prosecuted for violating state law. Had Congress found that state criminal prosecutions posed an intolerable

---

any felony committed." Idaho Code § 18–4009(4). Thus, if Horiuchi is unable to convince the district court that he is entitled to

immunity, he may nonetheless escape criminal liability if a jury believes that the shooting was justified as a matter of state law.

risk for federal agents, it could have tried to broaden the scope of that immunity. Instead, Congress has acquiesced in state prosecutions of federal agents and chosen to protect them by requiring that, when such prosecutions go forward, they do so in federal court. *See* 28 U.S.C. § 1442(a)(1).

Nor do we believe that allowing this case to proceed will open the floodgates to numerous state criminal prosecutions of federal agents, hampering federal law enforcement efforts. Assuming the facts alleged by the state, this is not a case where a law enforcement agent fired his weapon under a mistaken belief that his fellow agents or members of the public were in immediate danger. Rather, a group of FBI agents formulated rules of engagement that permitted their colleagues to hide in the bushes and gun down men who posed no immediate threat.

Such wartime rules are patently unconstitutional for a police action. As soon as the incident was over, the FBI disowned the rules and disciplined the officers who approved them. The incident led to a lengthy investigation by the DOJ Office of Professional Responsibility; Congress itself conducted extensive hearings and published a bipartisan report that was highly critical of the FBI in general and Horiuchi in particular.[28] There is nothing run of the mill about this case, and we cannot conceive that it will provide a precedent for state prosecutions in more ordinary circumstances.

## Conclusion

In keeping with the constitutional allocation of powers between the federal government and the states, federal agents enjoy immunity from state criminal prosecution. That immunity has limits. When an agent acts in an objectively unreasonable manner, those limits are exceeded, and a state may bring a criminal prosecution.

After carefully reviewing the record, we cannot agree with the district court that Agent Horiuchi's use of deadly force against Harris and, by extension, Mrs. Weaver, was objectively reasonable as a matter of law. Accordingly, Agent Horiuchi is not entitled to dismissal on the ground of Supremacy Clause immunity at this stage in the proceeding. On remand, the district court may conduct an evidentiary hearing to determine whether the evidence supports Agent Horiuchi's entitlement to immunity under the legal principles applicable to the use of deadly force. We therefore **REVERSE** and **REMAND** with directions that the district court reinstate the criminal complaint and information and for further proceedings consistent with this opinion.

---

**28.** The Senate Subcommittee Report concluded as follows:

> The Subcommittee concludes without reservation that the second shot should not have been taken. We believe that under the circumstances on August 22, as Randy and Sara Weaver and Kevin Harris ran back to their cabin, there was not the kind of immediate or imminent threat of real harm to others that could have justified deadly force. The snipers were concealed and remote. Even if a helicopter was present, it could not have been at risk from individuals fleeing headlong into a cabin after they had been shot at. There was simply no justification then present for the use of deadly force, while there was considerable risk of danger to the Weaver children....
>
> It is not our purpose to urge (or to urge against) prosecution or other sanction against Agent Horiuchi. But it is the Subcommittee's firm purpose to make sure that in the future, in similar circumstances, inappropriate and unconstitutional deadly force like the second Ruby Ridge shot will never again be used.

Ruby Ridge Report, *supra* n. 1, at 1119–20.

WILLIAM A. FLETCHER, Circuit Judge, with whom Circuit Judge THOMAS joins, concurring and dissenting:

I join in all but Part IV of the majority's opinion.

I concur in the majority's conclusion that there are disputed questions of fact material to agent Horiuchi's defense of Supremacy Clause immunity. I agree with the majority that these disputed questions preclude a holding that agent Horiuchi is entitled, as a matter of law, to a dismissal of the criminal prosecution brought by the State of Idaho.

However, I dissent from the majority's conclusion that these disputed questions of fact must be decided by a judge. I believe that a defendant in the position of agent Horiuchi is entitled to have a jury decide disputed issues of fact relevant to his immunity defense, for two independently sufficient reasons. First, our practice in dealing with the defense of qualified immunity in civil cases is to send disputed questions of fact to the jury. Second, the Sixth Amendment guarantees a jury trial.

We have held that a jury must resolve disputed questions of fact in determining whether a law enforcement officer is entitled to qualified immunity in a civil damages case. We held in *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir.1993), that where the relevant facts are undisputed, the district judge rules on the issue of qualified immunity on summary judgment. However, when those facts are in dispute, the case must proceed to trial. If the case is tried to a jury, the jury determines those facts. Once it does so, the district judge decides the reasonableness of the officer's behavior based on those facts. *Id.* at 873–74. I note that the Ninth Circuit appears to be unique in holding that the jury is only to resolve factual disputes. Other circuits give to the jury not only questions of disputed fact but also ques-

tions of reasonableness. *See, e.g., Hurlman v. Rice,* 927 F.2d 74, 78–79 (2d Cir. 1991); *Santiago v. Fenton,* 891 F.2d 373, 386–87 (1st Cir.1989); *Brandenburg v. Cureton,* 882 F.2d 211, 215–16 (6th Cir. 1989); *Melear v. Spears,* 862 F.2d 1177, 1184 (5th Cir.1989); *Turner v. Dammon,* 848 F.2d 440, 444 (4th Cir.1988), *abrogated on other grounds by Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987); *Fludd v. United States Secret Service,* 771 F.2d 549, 554 (D.C.Cir. 1985); *McSurely v. McClellan,* 697 F.2d 309, 321 & n. 20 (D.C.Cir.1982).

I am, of course, bound by our holding in *Act Up!/Portland,* although I also feel bound (in a different sense) to say that I disagree with it. *See Act Up!/Portland,* 988 F.2d at 874 (Norris, J., dissenting). The classic role of the jury, in both civil and criminal cases, is not only to resolve disputed questions of fact, but also to determine reasonableness based on the facts. But even taking *Act Up!/Portland* as good law, it is clear that in this circuit disputed questions of fact relevant to a defense of qualified immunity are to be resolved by a jury. I see no reason why disputed questions of fact concerning Supremacy Clause immunity should be treated differently.

Further, the Sixth Amendment guarantees a jury trial. Supremacy Clause immunity is an affirmative defense that can, and in this case does, involve disputes about whether the officer had an honest belief that what he did was necessary to perform his duty, and whether the officer was reasonable in his belief and actions. Where material facts are in dispute that prevent the summary resolution of these questions as a matter of law, the Sixth Amendment requires that they be sent to a jury.

In *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), the Court emphasized the importance of the jury's role in deciding questions of fact relevant to affirmative defenses. The Court held that before a defendant is entitled to a jury instruction on a defense, the judge must make a threshold determination that some evidence supports each element of the defense. The Court took pains to point out that its ruling was designed to strengthen, not weaken, the jury's role:

> The requirement of a threshold showing on the part of those who assert an affirmative defense to a crime is by no means a derogation of the importance of the jury as a judge of credibility.... On the contrary, it is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial to that directed at the elements of the crime or at affirmative defenses.

*Id.* at 416, 100 S.Ct. 624.

The Supreme Court also emphasized the importance of the jury in *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). The Court held that due process and the Sixth Amendment right to a jury trial require, in a prosecution for making material false statements, that the jury determine whether a statement is material. In so holding, the Court rejected the Government's position that the jury should only decide the factual components of elements of criminal offenses. *Id.* at 511, 115 S.Ct. 2310. The Court observed that "the application-of-legal-standard-to-fact ... commonly called a 'mixed question of law and fact,' has typically been resolved by juries." *Id.* at 511–12, 115 S.Ct. 2310. Because a materiality ruling involves " 'delicate assessments of the inferences a "reasonable [decisionmaker]" would draw from a given set of facts and the significance of those inferences to him,'" it "[is] peculiarly on[e] for the trier of fact." *Id.* (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (alterations in original)). Judgments about what inferences a reasonable decisionmaker would make, and how that decisionmaker would understand those inferences, are equally critical to the question of whether a defendant is entitled to Supremacy Clause immunity.

The majority does not discuss the Sixth Amendment, but it notes, without reference to the Amendment, that a jury is not required to resolve disputed questions of fact on a number of issues that can arise during the course of a criminal prosecution. The majority lists double jeopardy, immunized testimony and the scope of an immunity deal with the prosecution, attorney-client privilege, executive privilege, probable cause, and other evidentiary issues. In all of those cases, however, the judge decides issues that are collateral to the defendant's guilt.

In a case involving Supremacy Clause immunity, disputed questions of fact go directly to what the defendant did, and to whether the defendant honestly and reasonably believed that his or her actions were justified. I see no difference, from the standpoint of the Sixth Amendment, between a defense based on Supremacy Clause immunity and one based on self-defense. Both defenses concern justifications for a defendant's action; and both are based on assertions of an honest and reasonable belief held by the defendant which, if believed by the factfinder, require a verdict of not guilty. Neither is collateral to a defendant's guilt. Rather, both go directly to the question whether the defendant's conduct is, or can be, criminal under the law of the prosecuting authority.

The majority justifies remanding this case to the district judge to resolve the disputed questions of fact on the ground that it believes that judges, rather than juries, will better protect defendants asserting a defense of Supremacy Clause immunity. I do not know whether that is true in this case. I also do not know whether it is likely to be true in Supremacy Clause immunity cases generally. I do know, however, that it is not for us to make that assessment.

The Sixth Amendment guarantees a criminal defendant a right to a jury trial, and Federal Rule of Criminal Procedure 23(a) does not allow it to be waived inadvertently or easily. This rule requires that a criminal defendant waive it in writing, and that he have the approval of the court and the consent of the government. Ostensibly acting on behalf of defendants asserting a Supremacy Clause defense, the majority today chooses to waive for such defendants the jury trial right guaranteed by the Sixth Amendment and protected against waiver by Rule 23(a). A criminal defendant may sometimes waive his right to a jury trial. We may never do so.

MICHAEL DALY HAWKINS, Circuit Judge, with whom Chief Judge SCHROEDER, RYMER, SILVERMAN, and GRABER,* Circuit Judges, join, dissenting:

This case involves the application of well-settled law to the 1992 Ruby Ridge incident in Idaho. Both the district court and the panel majority correctly recognized that under the Supremacy Clause of the United States Constitution, FBI Special Agent Lon T. Horiuchi cannot be prosecuted for involuntary manslaughter by the state of Idaho for his role in this unfortunate affair.

In an effort to avoid the obvious import of over a century's jurisprudence on state prosecution of federal officers, the majority confuses disputes about the reasonableness of conduct with disputes about issues of material fact and conjures up issues of material fact that the state of Idaho never raised below and that even the author of the majority opinion has conceded do not exist.[1]

Despite the majority's protestations, there are no disputed issues of material fact in this case, and the majority's insistence on sending this case back for still more proceedings frustrates the clear intent of the law that Horiuchi and other federal officers be free from the harassing threat of state criminal prosecution for honest mistakes of judgment they might make when carrying out their federal duties.

## I. The Law of Supremacy Clause Immunity

As with many legal issues, historical context is critically important in understanding the nature and purpose of the Supremacy Clause defense raised by Horiuchi. For more than a century, in a virtually unbroken line of cases in which federal officers have faced state criminal charges for actions arising out of the performance of their official duties, United States courts have invoked the Supremacy Clause of the Constitution to shield federal agents from criminal liability. As John Marshall recognized, "there is a plain repugnance in conferring on one government a power to control the constitutional measures of an-

---

* Judge Graber concurs in all but footnote 12 of the dissent.

1. See Idaho v. Horiuchi, 215 F.3d 986, 998 (9th Cir.2000) (Kozinski, J., dissenting) ("The facts here are largely not in dispute."). The majority approach brings Ogden Nash to mind: "If we had some ham, we could have some ham and eggs, if we had some eggs."

other, which other, with respect to those very measures, is declared to be supreme over that which exerts the control." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431, 4 L.Ed. 579 (1819). Whether protecting judges from the threats of dissatisfied litigants, revenue agents from local moonshiners, unpopular prisoners from intimidating mobs, wartime shipbuilders from striking workers, or a child from a volatile crowd protesting court-ordered school desegregation, federal agents enforcing the laws of the nation can, on thankfully rare occasions, come into conflict with those who enforce the criminal laws of the states. When that occurs and when the federal agent is acting reasonably within the broad contours of official duty, and without malice, the courts have employed the Supremacy Clause to protect the agent from prosecution.

## A. Origins

The origins of an explicit Supremacy Clause immunity defense can be traced to *Tennessee v. Davis*, 100 U.S. 257, 25 L.Ed. 648 (1880), which concerned the federal government's long-standing efforts to protect its agents from prosecution in state courts. In *Davis*, a United States revenue agent was charged with murder in Tennessee state court. The agent contended that he was acting in self-defense in the scope of his duties as a revenue agent, and sought removal of his case to federal court. *Id.* at 259. Against Tennessee's challenge, the Supreme Court affirmed the legitimacy and importance of the federal-officer removal statute. The Court noted that, as early as 1815, Congress had provided for removal of state prosecutions against federal officers. *Id.* at 267. The current act

dated from 1833 and had been enacted in response to South Carolina's attempt to nullify federal law by criminalizing the collection of tariff duties by United States officers. *Id.* at 268. Invoking the Supremacy Clause, the Court stated, "The founders of the Constitution could never have intended to leave to the possibly varying decisions of the State courts what the laws of the government it established are ... and what protection shall be extended to those who execute them." *Id.* at 266. Such a situation would have been antithetical to the basic principles of American federalism:

> [The federal government] can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection ... the operations of the general government may at any time be arrested at the will of one of its members.

*Id.* at 263.

Although *Davis* did not explicitly recognize a Supremacy Clause immunity defense, the Court relied heavily on *Davis* in the landmark case of *In re Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890). *Neagle* established that federal officers were immune from state prosecution for acts committed within the reasonable scope of their duties.[2] The case began in a squalid dispute over the legitimacy of a purported California marriage between

---

**2.** The historical background to the *Neagle* case, a classic of law and order in the wild west, is explored in Paul Kens, *Justice Stephen J. Field: Shaping Liberty from the Gold Rush* to the Gilded Age (1997); and Carl Brent Swisher, *Stephen J. Field: Craftsman of the Law* (photo. reprint 1963) (1930).

Sarah Hill and William Sharon, a wealthy United States Senator from Nevada. After Sharon's death, Hill married her attorney, David S. Terry, a former Chief Justice of the California Supreme Court.[3] After considerable legal wrangling, Hill's case was heard before a three-judge panel that included United States Supreme Court Justice Stephen J. Field, who had previously served with Terry on the California Supreme Court. Abjuring the subtler arts of appellate advocacy for a more direct entree to the judicial mind, Mrs. Terry found one of the other panel members on a train and "pulled his hair with a vicious jerk." *Id.* at 44, 10 S.Ct. 658. When Justice Field later announced the panel's unsurprising decision against her, the courtroom degenerated into chaos and violence. A U.S. marshal attempted to escort Mrs. Terry out of the courtroom after she repeatedly interrupted the justice, but her husband announced that "no man living should touch his wife" and slugged the marshal in the face, knocking out a tooth. *Id.* at 45, 10 S.Ct. 658. Mr. Terry then drew a bowie knife and was finally subdued by officers, one of whom was Deputy Marshal David Neagle, a lawman who had spent his early days in Tombstone, Arizona.

Both husband and wife served contempt sentences for this incident, which apparently made their resentment toward Justice Field fester even more. They made repeated threats on his life, threats that were so visible that "the press of California was filled with the conjectures of a probable attack by Terry on Justice Field, as soon as it became known that he was going to attend the Circuit Court in that year." *Id.* at 47, 10 S.Ct. 658. The Attorney General recommended heightened protective measures for the justice, and David Neagle was given special instructions to guard the justice against attack.

Traveling with Justice Field on a train from Los Angeles to San Francisco, Neagle learned that Terry and his wife had boarded the train. Terry seems to have staked out Justice Field in the dining car, sending his wife back to their compartment to retrieve a revolver. Before she returned, Terry approached the justice from behind and struck him twice on the head. When Neagle ordered him to stop, Terry appeared to reach for a bowie knife, and Neagle fired two shots from his revolver, killing Terry. *Id.* at 52–53, 10 S.Ct. 658. The state of California then charged Neagle with murder; he in turn sought habeas corpus relief from the federal courts.[4]

The Supreme Court forcefully rejected the state's attempt to prosecute Neagle and clearly established the immunity of federal officers under the Supremacy Clause from state prosecution. If the officer had performed "an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than what was necessary and proper for him to do, he *cannot* be guilty of a crime under the law of the state of California." *Id.* at 75, 10 S.Ct. 658. The Court explained that this was emphatically not a question that was appropriate for a jury: "The circuit court

---

3. Terry is the subject of a book-length biography, A. Russell Buchanan, *David S. Terry of California: Dueling Judge* (1956). During his tenure on the California Supreme Court, Terry stabbed a San Francisco city official in a fit of temper. After his resignation from the court, he killed a United States Senator in a duel and then fought for the Confederacy in the Civil War.

4. California officials also arrested Justice Field for his role in Terry's death, although the charges were soon dropped. *See* Swisher, *supra* note 2, at 351–55.

of the United States was as competent to ascertain these facts as any other tribunal, and it was not at all necessary that a jury should be impaneled to render a verdict on them." *Id.* The immunity provided by the Supremacy Clause is an immunity from prosecution itself, and this determination is to be made, as "under all systems of criminal jurisprudence," by a "committing magistrate, or some similar authority, as to whether there is an offence to be submitted to a jury." *Id.*

The Supreme Court reaffirmed these principles nine years later in *Ohio v. Thomas,* 173 U.S. 276, 19 S.Ct. 453, 43 L.Ed. 699 (1899). In *Thomas,* the Court rejected an attempt by the state of Ohio to prosecute the director of a federal soldiers' home for violating a state statute relating to the use of oleomargarine. Federal officers, the court explained, "when discharging [their] duties under federal authority pursuant to and by virtue of valid federal laws, are not subject to arrest or other liability under the laws of the state in which their duties are performed." *Id.* at 283, 19 S.Ct. 453.

The *Thomas* court relied on *Davis, Neagle,* and, most heavily, on an important district court decision, *In re Waite,* 81 F. 359, 363–64 (N.D.Iowa 1897), *aff'd sub nom. Campbell v. Waite,* 88 F. 102 (8th Cir.1898). In *Waite,* a federal pension examiner, in the course of investigating fraudulent pension applications, was charged under a state statute with maliciously threatening "to accuse a person of a crime in order to compel him to do an act against his will." 81 F. at 361–62. The district court granted habeas relief, explaining:

If in the performance of these duties the officer so acts as to violate his duty to the United States, that government, and not the state, is the proper party to call him to account. If the acts done are violative of the rights of individuals, a civil action for damages may be maintained, or protection may be sought under the laws of the United States, and thus a remedy may be afforded to the citizen without bringing the federal and state governments into conflict, or without unduly interfering with the operations of that government under whose authority the officer is acting.

*Id.* at 363–64. The court recognized that "it certainly is the law that the officers and agents of the United States, such as the marshals, the deputy marshals, post-office inspectors, pension examiners, and the like, cannot be called to account before the courts of the states for the manner in which they perform the duties intrusted to them." *Id.* at 370. If states could hold "officers and agents of the United States ... responsible, under the criminal statutes of the state, for acts done in their official capacity," the states could "control or nullify the action of the authorities of the United States." *Id.* at 371.

*Waite* was in accord with another early application of *Neagle* in recognizing that Supremacy Clause immunity provided a broad defense against state criminal prosecution. A federal court in Washington explained the doctrine this way:

[W]here an officer, from excess of zeal or misinformation, or lack of good judgment in the performance of what he conceives to be his duties as an officer, in fact transcends his authority, and invades the rights of individuals, he is answerable to the government or power under whose appointment he is acting, and may also lay himself liable to answer to a private individual who is injured or oppressed by his action; yet where there is no criminal intent on his part he does not become liable to answer to the criminal process of a different government. With our complex system

of government, state and national, we would be in an intolerable condition if the state could put in force its criminal laws to discipline United States officers for the manner in which they discharge their duties.

*In re Lewis,* 83 F. 159, 160 (D.Wash.1897); *see also In re Fair,* 100 F. 149, 151 (C.C.D.Neb.1900) (noting that it was "well and firmly established" that an "act done by an officer or agent of the United States in and about a matter solely within federal control, and in pursuance of an authority given by the laws of the United States, is not an offense against the laws of the state").

## B. Applications

In 1920, Justice Oliver Wendell Holmes explained the Supreme Court's understanding of *Neagle:* "[E]ven the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States." *Johnson v. Maryland,* 254 U.S. 51, 56–57, 41 S.Ct. 16, 65 L.Ed. 126 (1920). Holmes recognized that the power of federal agents to employ deadly force can result in the loss of life. Federal courts have repeatedly granted Supremacy Clause relief to officers accused of unlawfully taking human life, even in situations in which differing conclusions could be drawn about the reasonableness of the agent's conduct.

Our most recent affirmation of this principle is *Clifton v. Cox,* 549 F.2d 722 (9th Cir.1977). Like this case, *Clifton* concerned an altercation between federal officials and criminal suspects at a remote cabin. Federal officers arrived by helicopter to execute federal search and arrest warrants at an alleged illegal drug manufacturing site. As the helicopter landed, one agent tripped and fell. Agent Lloyd Clifton, believing that his comrade had been shot, rushed to the cabin and kicked in the door. He did not knock, identify himself, or announce his authority before entering. As he entered, the subject of the arrest warrant jumped over a bannister into the backyard and began running toward a nearby wooded area. When the unarmed subject refused to halt, Clifton shot him in the back. He died shortly thereafter. *Id.* at 724.

We concluded, despite suggestions that Clifton's conduct violated internal regulations, that Clifton was entitled to Supremacy Clause immunity from state prosecution for second-degree murder and involuntary manslaughter. We emphasized that immunity depended on "whether the official employs means which he cannot honestly consider reasonable in discharging his duties or otherwise acts out of malice or with some criminal intent." *Id.* at 728. "Proper application of this standard does not require a petitioner to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Id.*

The facts in that case showed that a reasonable officer in Clifton's situation might have acted in the manner that he did. Clifton had an arrest warrant for the suspect. He "had been informed that the suspects might be armed and dangerous." *Id.* at 729. We therefore agreed with the district court that Clifton's conduct was "both honest and reasonable," in light of his belief that the occupants of the cabin were "potentially armed and dangerous" and his belief that the suspect's "escape into the woods would pose a danger to the lives of the pursuing officers." *Id.* at 729.

Other cases dealing with the use of deadly force are in accord with *Clifton.* The case most closely analogous to this

one is *United States v. Lipsett,* 156 F. 65 (W.D.Mich.1907). *Lipsett* involved a military sentry, Cyrus Gillette, who was supervising two military prisoners, one of whom, Hodsdon, escaped. Gillette chased after Hodsdon, loading his gun as he ran. Gillette initially held his fire because of some children in the street, but eventually decided to fire at the escapee. "The bullet passed over Hodsdon's head and accidentally struck and killed Miss Elizabeth Cadenhead, who, with friends, was returning from a visit to Ft. Brady, and was walking along the street on which Gillette and Hodsdon were running." *Id.* at 66. State officials subsequently charged Gillette with manslaughter.

The district court held that Gillette was entitled to Supremacy Clause immunity and to habeas relief. The court noted, "No claim is made on the part of the state authorities that Gillette had any malice or ill will towards either Hodsdon or Miss Cadenhead, or that the homicide was other than accidental; and there is nothing in the evidence presented on the hearing reasonably tending to show, nor is it asserted, that Gillette, in firing the shot, did not act in good faith and in the supposed performance of his duty." *Id.* at 67. The state contended, however, that there was a question of fact "whether there was any other possible means of preventing the escape of the fugitive than by firing, and whether Gillette exercised due care ... the street being unobstructed, and it thus having been possible to discover that Miss Cadenhead and her companions were in the line of fire." *Id.*

The court held that the reasonableness of Gillette's conduct, and thus his immunity, was properly decided by the court, and not by the jury. "[T]he suggestion that different minds might draw different inferences from undisputed facts furnishes no reason why I should abdicate my responsibility to decide in this proceeding whether the guard, in shooting at the fleeing deserter, acted in the supposed discharge of his duty." *Id.* at 71. In this case, if the "guard, in shooting as he did, was acting in the supposed exercise of his duty, *without malice or criminal intent ... he is not liable to prosecution in the state court from the fact that from misinformation or lack of good judgment he transcended his authority,* even though he might be liable to a civil action at the suit of the injured party." *Id.* (emphasis added). The court concluded, "Even though it might have been more prudent for the guard to have exercised still greater care in the prevention of this deplorable accident, such fact would not convert this accident into a crime." *Id.* at 72.

In *Ex parte Warner,* 21 F.2d 542 (N.D.Okla.1927), the court granted Supremacy Clause immunity to a prohibition agent who accidentally shot and killed a man whom he was trying to arrest. The case was "extremely unfortunate," but "federal courts will not permit a federal officer or agent to be restrained of his liberty by state authority for an act done in pursuance to federal law." *Id.* at 544, 543.

In *West Virginia v. Laing,* 133 F. 887 (4th Cir.1904), federal marshals enlisted local citizens as a posse comitatus to help serve a federal arrest warrant. John Harless, the subject of the warrant, ran toward the officers carrying a pistol. He then turned toward a large tree, and two of the citizens opened fire, killing him instantly. *Id.* at 888. The court found that this incident was "unfortunate, and the result [was] greatly to be deplored." *Id.* at 889. However, the court noted that "there was no feeling of animosity on [the citizens'] part towards Harless, and no motive existed because of which either of them would have been induced to do him

harm." *Id.* at 890. They knew that Harless was "a dangerous and desperate character," and they reasonably believed that, when he turned to the shelter of the tree, he was intending to open fire on them. *Id.* at 890–91. Accordingly, they were entitled to Supremacy Clause immunity. The court rejected the state's claim that the case ought to go to a jury, stating, "Congress certainly intended, in cases of this character, that the judges of the United States should hear the evidence, and without a jury proceed in a summary way to pass upon the federal question involved." *Id.* at 891.

*In re Fair,* 100 F. 149 (C.C.D.Neb.1900), involved soldiers who shot and killed a deserter. After a military court found the soldiers not guilty of manslaughter, the state of Nebraska instituted criminal proceedings against them. *Id.* at 151. The federal court granted habeas relief on the ground of Supremacy Clause immunity. The evidence revealed no malice, and, accordingly, if the soldiers "acted without any criminal intent, but in an honest belief that they were only discharging the duties of a soldier," they could not be guilty of a crime against the state. *Id.* at 155.

Of course, the importance of Supremacy Clause immunity is not restricted to the regrettable situations in which there is a loss of life. It matters in all kinds of cases in which federal agents are attempting to enforce federal law in the face of local intransigence. A good example of this is the case of *In re McShane,* 235 F.Supp. 262 (N.D.Miss.1964). In *McShane,* the state of Mississippi attempted to prosecute James McShane, the Chief of the Executive Office of the United States Marshals, for his role in enforcing James Meredith's right to attend the University of Mississippi. A large crowd had gathered to challenge Meredith's admission, and McShane ordered his marshals to use tear gas on the crowd, provoking a tumultuous riot. *Id.* at 269. The state charged McShane with breach of the peace and unlawful and felonious use of force. *Id.* at 264. McShane sought relief in federal court.

The district court noted that the parties disputed the reasonableness of McShane's conduct. McShane contended that the crowd was "fast getting out of hand," that the use of tear gas was proper, and that the gas used "was a safe and proper kind for use against crowds." *Id.* at 269. Mississippi contended that the crowd was not out of control, that a "wrong and dangerous type of gas was used indiscriminately and recklessly," and that the firing of tear gas into a group of students "was wholly unnecessary." *Id.* There was also evidence that the Deputy Attorney General disapproved of the use of gas and felt that "somebody jumped the gun." *Id.* at 270.

The district court readily granted McShane's petition, noting McShane's uncontradicted testimony that he honestly felt his actions were necessary to implement court-ordered integration. *Id.* "[E]stimating the temper of a crowd," the court noted, "is a matter of judgment. The difference between a mob and a crowd is gossamer thin." *Id.* After an extensive review of the case law, the court concluded that federal officers were to be denied immunity from state prosecution only if they *"employ means which they cannot honestly consider reasonable in discharging their duties or who otherwise act out of malice or with some criminal intent."* *Id.* at 273 (emphasis in original). The substance of the standards applied in the case law was "that of honest and reasonable belief." *Id.* at 274.

If, as here, the petitioner shows without dispute that he had no motive other than to discharge his duty under the circumstances as they appeared to him and that he had an honest and reasonable

belief that what he did was necessary in the performance of his duty ... then he is entitled to the relief he seeks. *This is so even though his belief was mistaken or his judgment poor.*

*Id.* (emphasis added). The court accordingly granted McShane Supremacy Clause immunity.

*McShane* is typical of federal cases in which courts have invoked Supremacy Clause immunity to protect the operations of the federal government from state interference. *See, e.g., Hunter v. Wood,* 209 U.S. 205, 28 S.Ct. 472, 52 L.Ed. 747 (1908) (railroad official acting under a federal injunction who was charged under state law with overcharging for a railroad ticket); *Boske v. Comingore,* 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846 (1900) (Treasury official who, pursuant to federal regulations, refused to produce records to state officials); *Kentucky v. Long,* 837 F.2d 727, 745 (6th Cir.1988) (FBI agent who allegedly committed a burglary as part of an undercover operation; "a mistake in judgment or a 'botched operation,' so to speak, will not of itself subject a federal agent to state court prosecution"); *Baucom v. Martin,* 677 F.2d 1346 (11th Cir.1982) (FBI agent who bribed a state prosecutor in an undercover operation); *Texas v. Carley,* 885 F.Supp. 940 (W.D.Tex.1994) (Fish and Wildlife officer charged with criminal trespass while making National Wetlands Inventory); *Connecticut v. Marra,* 528 F.Supp. 381, 386 (D.Conn.1981) (Federal Informant who, in an "error[ ] resulting from confusion or nervousness or bad judgment," exceeded his authority and attempted to bribe a police officer); *Lima v. Lawler,* 63 F.Supp. 446 (E.D.Va.1945) (naval shore patrolman charged with assault for striking city policeman who interfered with arrest of a serviceman); *Brown v. Cain,* 56 F.Supp. 56 (E.D.Pa.1944) (Coast Guard official charged with quelling riots who shot and killed a man he suspected had thrown a brick at him); *Ex parte Beach,* 259 F. 956 (S.D.Cal.1919) (customs agent who fired shots at the roadster of a suspected opium smuggler); *In re Wulzen,* 235 F. 362 (S.D.Ohio 1916) (National Guard officers who pushed people out of the way of a military march); *In re Turner,* 119 F. 231, 235 (C.C.S.D.Iowa 1902) (federal officer constructing sewer pipe to army base against prosecution for violation of a state injunction; "an officer of the United States ... acting in obedience to commands ... is not subject to arrest on a warrant or order of a state court"); *United States ex rel. Flynn v. Fuellhart,* 106 F. 911 (C.C.W.D.Pa.1901) (Secret Service agents charged with assault and battery for arresting a counterfeiter); *In re Lewis,* 83 F. at 160 (Treasury agents who, with "bad judgment," executed an illegal search warrant); *United States ex rel. McSweeney v. Fullhart,* 47 F. 802 (C.C.W.D.Pa.1891) (U.S. marshals who drew their guns at state constables while escorting a federal arrestee into custody).[5]

Indeed, there appear to be only four instances in the entire history of our nation in which federal courts have denied Supremacy Clause immunity to an officer who has sought protection from state criminal prosecution.[6] None of these four cases bears any resemblance to this one.

In the first case, *United States ex rel. Drury v. Lewis,* 200 U.S. 1, 26 S.Ct. 229,

---

**5.** It strains all credibility to assert, as the state of Idaho did at oral argument, that there is "no such thing as Supremacy Clause immunity."

**6.** The defendant in *Arizona v. Manypenny,* 672 F.2d 761, 762 (9th Cir.1982), also did not receive Supremacy Clause immunity, but this was because he "apparently made a strategic choice not to raise the federal immunity defense."

50 L.Ed. 343 (1906), the Supreme Court affirmed a trial court's denial of habeas relief to an Army officer and an enlisted man who were indicted for homicide in a Pennsylvania state court. The defendants were trying to stop thefts on a military base, and they found "three or four half-grown boys or young men" congregated in the street. *Id.* at 3, 26 S.Ct. 229. They contended that they fired at one of the boys to prevent his escape. However, other witnesses contended that the boy surrendered and begged the officers not to shoot him, but they shot him anyway. *Id.* at 2–3, 26 S.Ct. 229. This presented a substantial conflict in the testimony, suggesting that the officers may have acted with deliberate criminal intent.[7] The Supreme Court stressed that habeas relief was "an exceedingly delicate jurisdiction," *id.* at 7, 26 S.Ct. 229, and concluded that the trial court did not abuse its discretion in denying habeas relief, *id.* at 8, 26 S.Ct. 229.

The second case, *Castle v. Lewis,* 254 F. 917 (8th Cir.1918), concerned federal officers who shot and killed a man they suspected was illegally transporting whiskey into Indian country. The district court denied habeas relief, and the circuit court reviewed for abuse of discretion. *Id.* at 921, 926. The Eighth Circuit noted that there was "a substantial conflict" in the evidence with respect to what happened. *Id.* at 926. Moreover, the court imposed a novel requirement that petitioners specifically show that trial of their case in state court would "seriously interfere with the enforcement of the laws of the United States or the operations of its government." *Id.* at 921.

The third case, *Birsch v. Tumbleson,* 31 F.2d 811 (4th Cir.1929), relied heavily on *Castle.* *Birsch* involved federal game wardens who killed two hunters. The Fourth Circuit affirmed the trial court's denial of habeas relief, since the only witness to the shootings (other than the defendants), asserted that they had simply opened fire on the hunters for no apparent reason. *Id.* at 812.

The fourth case, *Morgan v. California,* 743 F.2d 728 (9th Cir.1984), was, until today, the only case in which a federal appellate court has reversed a district court's holding that a defendant is entitled to Supremacy Clause immunity. Like the other three cases, *Morgan* arose from a habeas petition. Unlike the other cases, however, it was not primarily about the reasonableness of an officer's conduct. Rather, it addressed whether the officers were on official business or on what tort scholars might term a "frolic and detour." Two DEA agents, who by all accounts were intoxicated, backed their car into another car and got into an altercation with that car's owner. The agents later followed the owner to a jewelry store, where, the owner alleged, the agents assaulted him. *Id.* at 729–30. Although the agents claimed they were on their way to meet an informant at the time of the accident, other testimony suggested they were heading to the Police Academy for drinks. *Id.* We reversed the district court's grant of habeas relief against state prosecution for various misdemeanor offenses, concluding that there was a substantial conflict in the evidence with respect to whether the officers were engaged in official business at the time of the incident. *Id.* at 734.[8]

---

7. The lower court had found a "serious conflict of evidence involving an important issue of fact." *United States ex rel. Drury v. Lewis,* 129 F. 823, 827 (C.C.W.D.Pa.1904).

8. We also noted in *Morgan* that federal courts can issue writs of habeas corpus to federal agents if it appears that the prosecution is designed "to frustrate the enforcement of federal law." *Id.* at 733. In such cases, the

These four cases are instructive. Each involved a substantial conflict in the evidence. In three cases, there was evidence suggesting that the federal officers acted with deliberate malice. In the fourth, there was evidence suggesting that the federal officers were not on official duty at the time of the incident. Neither circumstance, of course, is present here. Idaho's indictment alleges that Horiuchi acted "without malice," and there is no dispute that Horiuchi was acting within his official duties. The majority therefore cannot point to any case that is on all fours with this one-that is, a case in which a court denies Supremacy Clause immunity based on a second-guessing of the reasonableness of actions taken by an agent indisputably acting without malice and while on official duty. This does not necessarily mean that such a case might not exist, but it does suggest the unprecedented nature of denying immunity on the facts of this case. The vast weight of authority is that poor judgment, mistaken assumptions, and excessive zeal alone are not sufficient to subject a federal agent to state criminal prosecution.

## C. Standards

The case law establishes that a federal agent is entitled to immunity from state prosecution if he was acting within the scope of his official duties and employing means that he honestly and reasonably considered necessary to the discharge of those duties. *See, e.g., Clifton,* 549 F.2d at 726, 728.

As the majority properly points out, state criminal prosecution of a federal agent is much more serious than an action against that officer for civil damages. (Majority at 376.) The federal government cannot indemnify prison time. This consideration warrants a strong inference that Supremacy Clause immunity is broader than qualified immunity and more protective of the federal officer. Indeed, no judicial decision has ever equated the two forms of immunity.[9] Where precisely these contours lie it is not necessary to decide.[10] At minimum, Supremacy Clause immunity is at least as broad as qualified immunity, which is itself broader than the scope of the underlying constitutional right.

The Supreme Court has recognized that officers who violate a constitutional provision are nonetheless entitled to qualified immunity if they might have reasonably thought their actions were constitutionally permissible. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). As the Court explained, "We have recognized that it is inevitable that law enforcement officials will in some cases *reasonably but mistakenly* conclude that [their action is constitutional]" and that

"writ should be granted even if the judge has to resolve factual disputes to arrive at that conclusion." *Id.*

**9.** Early cases applying *Neagle* explicitly stated that civil liability might lie in cases in which a federal officer was nonetheless immune from state prosecution under the Supremacy Clause. *See, e.g., Lipsett,* 156 F. at 71; *Lewis,* 83 F. at 160; *Waite,* 81 F. at 363.

**10.** The majority's statement that we have previously held that Horiuchi is not entitled to qualified immunity is simply wrong. (Majority at 372 n. 22.) In a civil suit brought by Kevin Harris against various federal officers, we denied the officers' motion to dismiss on the grounds of qualified immunity. *Harris v. Roderick,* 126 F.3d 1189 (9th Cir.1997). In ruling on the motion to dismiss, we merely held that the officers could not establish qualified immunity on the bare facts alleged in the complaint. The suggestion that the officers might never establish this immunity was pure dictum, unnecessary to the resolution of that appeal. *Id.* at 1202–05. The case was subsequently settled by the government.

they should not be held personally liable for their mistakes. *Id.* at 641, 107 S.Ct. 3034 (emphasis added). Under qualified immunity, an officer is protected if "officers of reasonable competence could disagree" on an issue. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In immunity cases, the court "should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact." *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam). At minimum, Supremacy Clause immunity provides this much protection to the federal officer: He is entitled to immunity unless *no reasonable officer* in the situation would have acted in that manner. We do not ask whether every reasonable agent would have done precisely the same thing. We do not ask whether the agent made an error of judgment. Nor need we determine, with pin-point precision, whether the acts were constitutional.[11]

When a federal officer raises a Supremacy Clause immunity defense, the burden shifts to the state "to come forward with [an] evidentiary showing that disputed issues of fact exist to rebut the claim of the federal officer." *Long,* 837 F.2d at 751. If the state makes such a showing, the disputed facts must then be resolved, either by a judge or by a jury. We need not reach the issue of who resolves these disputes, however, because in this case there are no disputed material facts.[12]

With these principles in mind, we turn to the events of August 22, 1992.

## II. Special Agent Horiuchi's Conduct

### A. Issues of Material Fact

The majority asserts that there are six major disputed issues of material fact in this case (Majority at 368–69.) Although we will explain in some detail why none of these "disputes" constitutes a disputed material fact under the governing case law,

11. Not every constitutional wrong carries precisely the same set of constitutional remedies. *See generally* John C. Jeffries, Jr., *The Right–Remedy Gap in Constitutional Law,* 109 Yale L.J. 87 (1999). State criminal law is certainly not the only mechanism by which federal officers can be restrained from misconduct. Federal officers who violate individual rights place their employment at jeopardy and risk the disintegration of their entire careers. They also risk federal prosecution, lawsuits, and public humiliation. In this case, although officers were disciplined for their actions at Ruby Ridge, an extensive federal criminal investigation cleared Horiuchi of any wrongdoing.

12. Forced to confront the issue squarely, resolution of the factual issues pertaining to immunity by the judge seems more consistent with the protective purposes of Supremacy Clause immunity. In the procedural posture of this case, however, the majority's remand for an evidentiary hearing makes little sense.

Idaho specifically opposed an evidentiary hearing on Horiuchi's motion to dismiss, despite case law holding that the state was obligated to "come forward with [an] evidentiary showing that disputed issues of fact exist to rebut the claim of the federal officer." *Long,* 837 F.2d at 751. Granting a form of relief that the appellant not only failed to request on appeal, but actively opposed in the district court, turns appellate review on its head. In effect, Idaho is being given a second bite at an apple that it deliberately discarded when formulating its litigation strategy. Idaho mistook the law, and it bore the risk of that mistake.

To the extent that the district court was required, under the majority's view, to resolve disputed issues of fact, it has already done so. The majority may not like it, but the district court's conclusion that Idaho failed to present any significant factual disputes effectively resolved any lingering factual issues against Idaho. [Judge Graber does not concur in this footnote.]

the most telling evidence about the existence of these "disputes" is that the author of the majority opinion disavowed them in his dissent to the panel opinion. The seventh sentence of that dissent announces, "The facts here are largely not in dispute." *Horiuchi*, 215 F.3d at 998 (Kozinski, J., dissenting). The author then drops a footnote that states, "The *one key factual dispute* cuts against the majority's conclusion." *Id.* at 998 n. 2 (emphasis added). Indeed, the only disputed factual issue argued by the state of Idaho in the district court related to Horiuchi's knowledge of Vicki Weaver's position. The dissent accordingly argued that Horiuchi's conduct was unreasonable as a matter of law.

The panel had the benefit of full and extensive briefing and, in the year that elapsed between oral argument and the filing of the decision, had plenty of time to scour the record for disputed material facts. Yet despite all that, the dissent could come up with only one possible factual dispute. The dissent never argued that the factual record was incomplete or that the district court needed to take another look at what happened. The majority now dredges up five new purported factual disputes that no one on the panel, including the dissent, ever noticed, and that Idaho *never* argued below. No one noticed them because they are not real disputes about material facts at all. They are primarily a series of assertions and second-guesses about the reasonableness of Horiuchi's conduct-the bread and butter of the dissent from the panel opinion dressed up as disputes about material fact.

## 1. The Location of the Helicopter

The majority summarizes its contentions about the helicopter by noting, "it seems highly debatable whether a reasonable agent in Horiuchi's position would have believed that the helicopter would be endangered if the man with the gun reached the cabin." (Majority at 370.) Of course, this is not an issue of material fact; it simply restates the basic question whether Horiuchi acted reasonably-that is, the question whether he is entitled to immunity. To show a genuine issue of material fact the majority must do more than show that reasonable people in Horiuchi's position might have acted differently. It must do more than make a plausible argument that Horiuchi acted unreasonably. It must show some substantial conflict in the evidence about a material fact.

The majority purports to identify a dispute about the precise location of the helicopter. Although Idaho argued strenuously in the district court that there were multiple disputed issues of material fact, it never once challenged Horiuchi's account of the helicopter's location, or even mentioned the helicopter at all. (In fact, the word "helicopter" *never* appears in Idaho's opposition to Horiuchi's motion for immunity.) Nor did Idaho mention the helicopter issue in its opening brief to this court. Once Horiuchi raised the Supremacy Clause immunity defense, the burden shifted to the state "to come forward with [an] evidentiary showing that disputed issues of fact exist to rebut the claim of the federal officer." *Long*, 837 F.2d at 752. It is not our role to litigate Idaho's case for it; that is why we require "[p]arties before district courts ... to prepare their cases in a thorough manner." *United States v. Matthews*, 240 F.3d 806, 810 (9th Cir.2001). Idaho's failure to come forward with specific evidence challenging the location of the helicopter prohibits the majority from relying on it on appeal.

As we have previously explained,

Requiring the district court to search the entire record for a genuine issue of fact, even though the adverse party does

not set it out in the opposition papers, is also profoundly unfair to the movant. . . . If the district court, *or later this court,* searches the whole record, in practical effect, the court becomes the lawyer for the respondent, performing the lawyer's duty of setting forth specific facts showing that there is a genuine issue for trial. The movant is then denied a fair opportunity to address the matter in the reply papers.

*Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1031 (9th Cir.2001) (emphasis added). The majority, without the slightest shred of explanation, does precisely what *Carmen* squarely forbids: It finds reversible error because a district court failed to search the record for disputed facts that Idaho never raised and never argued and to which Horiuchi has never had an opportunity to respond.

Even if the issue were properly before the court, the shred of testimony upon which the majority relies is taken entirely out of context and does nothing to advance its argument. Horiuchi testified on direct examination that, prior to his first shot, he was searching "this area here with the naked eye." (Horiuchi Testimony at 83.) At that point, an armed male "stopped and prodded in the ground with a stick or something and looked up at the helicopter or what I perceived to be a helicopter somewhere behind my location." *Id.* Horiuchi did not fire a shot at this point.

Horiuchi subsequently began looking through his rifle scope. *Id.* at 84. Horiuchi could hear the helicopter "moving either somewhere behind me or off to my right." *Id.* at 85. Horiuchi then observed the armed male "looking for the helicopter." *Id.* at 87. Through the scope, Horiuchi could see the male "watching the heli-

copter, and at times he would kind of bring his weapon up." *Id.* at 88. "His view, or his facial view, was above and to the right of my location, and that is where I heard the helicopter or where I perceived that the helicopter was, and I'm assuming that's what he was watching." *Id.* at 88. Then the male began running, and "evidently the helicopter popped up and maybe he thought that he was seen by the people in the helicopter." *Id.* at 89. Horiuchi then perceived that the male was "getting ready to take a shot at the individuals in the helicopter." *Id.* at 90. Horiuchi subsequently fired his first shot. On cross-examination, Horiuchi was asked where the helicopter was at the time of the shot. He responded that "I don't know where the helicopter was, sir, I would be guessing if I told you where it was." *Id.* at 259.

The majority concludes that this testimony is "inconsistent." (Majority at 369.) It is nothing of the sort. Horiuchi freely admits that at the time of the first shot, he did not know the precise location of the helicopter. How could he? He was looking through his rifle scope, as snipers must. His sense of the helicopter's location was based on hearing the sound of the helicopter and on the armed man's reaction to something in the air. There is nothing inconsistent between this testimony and his testimony about what happened at an earlier point, when he was *not* looking through his rifle scope. Between the time that Horiuchi was observing the area with his naked eye and the time he fired the first shot, the helicopter, quite simply, had moved. This is hardly the stuff of which disputed material facts are made.[13]

---

13. The majority erroneously states that "Horiuchi admits that he never actually saw the helicopter." (Majority at 369.) In fact, Horiuchi testified that he saw the helicopter as it lifted off. (Horiuchi Testimony at 66.)

In a final effort to create a disputed issue about the helicopter, the majority cites Randall Weaver's testimony before a Senate subcommittee. (Majority at 369 n. 16.) Idaho never submitted this or similar evidence to the district court, and it has never been made a part of the record. It is an elementary principle of law that disputed facts must be part of *the record.*[14] *See Willis v. Pacific Mar. Ass'n,* 236 F.3d 1160, 1168 (9th Cir.2001) ("The appellate court is limited to evidence in the record."). Whether this testimony is appropriate for judicial notice is beside the point: District courts do not commit reversible error by failing to search the Internet sua sponte for evidence a party might have, but failed, to submit.

In sum, there is no evidence whatsoever in this record that the helicopter was not where Horiuchi said it was-that is, that it was flying in close vicinity of the cabin.

## 2. The Rules of Engagement

The majority here relies on vague suggestions that Horiuchi lied about his motive and that he relied on the Rules of Engagement when he fired his shots. Idaho never made any of these arguments in the district court, but even assuming the issue was before us, the majority presents no substantive dispute of *material fact.*

Horiuchi concedes that the Rules of Engagement permitted him to fire at any armed male, and he concedes that the instructions he gave his men prior to the beginning of the mission reflected those Rules. Horiuchi has never argued that this conduct can be justified solely on the basis of those Rules, and he has declined to rely on them in his defense of this case.

The majority makes much of the fact that Horiuchi's conduct could be consistent with the Rules of Engagement. However, at the beginning of the incident, Horiuchi specifically declined to fire a shot at an armed male because "there was no really threatening movement at that time." (Horiuchi Testimony at 84.) And Horiuchi did not fire at unarmed people, because, obviously, unarmed people did not pose any threat. Horiuchi's testimony is that he only fired when he observed what appeared to be a genuine threat to the safety of the helicopter.

The majority's argument seems to suggest that once the Rules of Engagement had been articulated, Horiuchi could never develop independent grounds for employing deadly force. Of course, this argument proves too much. Suppose a federal officer tells a subordinate, "Shoot and kill anyone on the street to whom you take a dislike." The officer then observes an armed man firing an automatic weapon at a crowd of schoolchildren, and the officer shoots and kills the armed man. No one would contend that such an officer should be subject to state prosecution, even if his conduct is fully consistent with unconstitutional orders.[15] That is the issue present-

---

14. The majority's use of this material is also highly selective. *Compare* Majority at 369 ("[none] of the other agents on the scene reacted as if they thought the helicopter was in danger") *with The Federal Raid on Ruby Ridge, Idaho: Hearings Before the Subcomm. on Terrorism, Technology and Gov't Information of the Comm. of the Judiciary,* 104th Cong. 320–21, 331, 343–44, 353 (1995) (testimony that two other Hostage Rescue Team members perceived a direct threat to the helicopter at all times in the incident and that they held fire only because they could not get a clean shot).

15. This is not to say that there is no subjective component to the determination of immunity or that mental state is irrelevant. If, in the example above, the officer shot the man, but was unaware that the man was shooting at schoolchildren and simply saw the back of a man whose shirt color he disliked, he could not have had an honest belief in the reasonableness of his actions. Accordingly he

ed here. Assuming, arguendo, that reliance on the Rules of Engagement might be constitutionally troublesome, the issue is whether intervening circumstances are sufficient that Horiuchi could have formed independent grounds for firing his shots. That may be disputed, but it is not a disputed issue of *fact.*

Moreover, to the extent that Idaho or the majority is suggesting that Horiuchi and his colleagues organized a summary execution and hunted down their victims in cold blood, that argument is squarely foreclosed by the criminal complaint. If such conduct was the factual predicate of the complaint, Horiuchi should have been charged with murder. Instead, Horiuchi was charged with "unlawfully, but without malice," operating "a firearm in a reckless, careless, or negligent manner."

Under Idaho law, involuntary manslaughter is:

> the unlawful killing of a human being, without malice .... [1] in the perpetration of or attempt to perpetrate any unlawful act, other than arson, rape, robbery, kidnapping, burglary, or mayhem; or [2] in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; or [3] in the operation of any firearm or deadly weapon in a reckless, careless or negligent manner which produces death.

Idaho Code § 18-4006. The complaint charges Horiuchi under the third of these definitions. Specifically, the complaint states that Horiuchi discharged "the firearm through the front door of the Weaver residence in an attempt to shoot Kevin Harris as he entered the door from outside, without first determining whether any person other than his intended target

would be denied immunity, even though his conduct would be permissible if he had been

was present on the other side of the door." At oral argument, Idaho's counsel stated that, at most, Horiuchi acted with "excessive zeal."

Idaho did not charge Horiuchi under the first of the three definitions of involuntary manslaughter, which it could have easily done if it believed Horiuchi's second shot was unlawful. Nor did it charge him with murder. Idaho never argued in the district court that Horiuchi's conduct was motivated by unconstitutional Rules of Engagement. In fact, it never once questioned Horiuchi's motives for taking that shot. The only issue it raised was the *manner* in which that shot was fired. There is obviously no concept in the criminal law of a "greater included offense." Thus the only issue in this appeal is whether Horiuchi's alleged "excessive zeal" can expose him to state criminal prosecution for "reckless, careless or negligent" behavior. There might be a dispute on this point, but it is not a disputed issue of material fact.

### 3. Feasibility of a Warning

The majority contends that Horiuchi might have given a warning before firing. The majority states, "On the evidence before us, we cannot hold that Horiuchi has established that he reasonably believed giving a warning, as required by *Garner,* was not feasible." (Majority at 372–73.) The majority here abandons any pretense that material facts are at issue. This is solely an issue about the reasonableness of Horiuchi's conduct on the basis of undisputed facts, which is probably why Idaho never raised this argument below. Since it does not present a factual issue, it is

aware of additional facts.

appropriate for resolution by this court. *See Lipsett,* 156 F. at 71.

### 4. Certainty of Target

Again, the majority fails to discuss any disputed material facts and advances an argument that Idaho never made below. The majority merely notes that Horiuchi may not have been certain of his target and may have acted unreasonably. (Majority at 373.) This is purely an issue about the reasonableness of Horiuchi's conduct, which, in the context of Supremacy Clause immunity, is a legal issue for the court to resolve. The majority identifies no further factual inquiries that would be necessary for proper resolution of this issue.

### 5. Horiuchi's Knowledge of Vicki Weaver's Position

The majority's cursory treatment of this issue is surprising given that this is the only disputed material fact that Idaho relied on in opposing Horiuchi's motion to dismiss. Horiuchi contends that he did not know that Vicki Weaver was behind the door when he fired his second shot. Idaho contends that he knew or should have known that she was standing there. Both the district court and the panel majority correctly concluded that Idaho had not presented a genuine issue of material fact as to whether Horiuchi knew Vicki Weaver was behind the door. Whether he *should* have known she was there if he had been more prudent is a question of reasonableness, not an issue of material fact.

Idaho and today's majority rely on three pieces of evidence to show that Horiuchi knew that Weaver was behind the door: the preliminary hearing testimony of Sara and Randall Weaver and Horiuchi's testimony in the Weaver and Harris criminal trial. None of this testimony creates the disputed material fact that the majority contends it does.

The majority states, "Both Sara and Randy Weaver testified that, after the first shot, Vicki Weaver came onto the porch and called out, and so Horiuchi could have seen or heard her." (Majority at 373.) This seriously misstates the testimony. Although both Weavers testified that each saw Vicki Weaver come outside of the cabin, neither one can place her outside the threshold of the door at the relevant time period.

Randall Weaver testified that, right after he was shot, he saw Vicki Weaver. When asked where she was, he stated, "I'm gonna guess three or four feet from the porch." (Preliminary Hearing Testimony at 88.) Weaver then began running back to the cabin. His testimony continues:

Q: So you're telling us she was carrying her baby in the middle of a fire fight, knowing that a shot had rung out, she came running out of the house holding her baby?

[Objection and ruling omitted.]

A: She came out of the house with the baby—she might have been on the porch. I don't know, to be honest with you.

(Preliminary Hearing Testimony at 92.) All this testimony shows is that at some point Vicki Weaver was off the porch. There is nothing here that shows that when Horiuchi later fired the second shot he *knew* that she was behind the door.

Sara Weaver's testimony is even less supportive of the majority's claims. She testified thus:

Q: Is it your testimony that your mother—did your mother, did you ever see your mother actually come beyond the doorway?

A: No.

Q: Did you see her ever come as far as the doorway itself or was she inside?

A: I don't remember.

(Preliminary Hearing Testimony at 51.) Sara's testimony therefore cannot even establish that Vicki Weaver was *ever* in a position where Horiuchi could see her.

The majority also asserts that "Sara Weaver testified that the curtain on the door was open, and so Horiuchi could have seen her mother through the glass pane on the door." (Majority at 373 (citation omitted)). Again, the majority misstates the testimony. Sara testified that the curtains over a glass pane on the door were pulled open, but she *never* testified that Horiuchi could see through the pane. In fact, when asked about this specific issue, Horiuchi explained that he could not see through the glass:

Q: Describe the glass window?

A: It appeared like a six-pane glass window with curtains or something else on it, like plastic or something, on the door and even on the glass.

Q: Could you see through the window of the door?

A: No.

(Horiuchi Testimony at 109–10.)

Idaho was required to come forward with "disputed issues of fact." *Long*, 837 F.2d at 752. There is no dispute here. Horiuchi did not state that the curtain was closed, and Sara Weaver's testimony did not establish, must less even assert, that a person in Horiuchi's position would be able to see through the glass. Even if Idaho had presented the tiniest shred of evidence that a person at Horiuchi's position under those weather conditions would have been able to see through that type of glass at that angle (which it has not), Horiuchi's failure to look through it would at most go to the reasonableness of his conduct. It would not create a disputed issue of fact.

Finally, the majority relies on Horiuchi's testimony from the Weaver and Harris criminal trial. Horiuchi did not testify, as the majority claims, that "he thought someone else might be standing behind the door." (Majority at 373.) The testimony, in context, is as follows:

Q: Describe the position of that second male adult in relation to the open door of the house when you fired that shot?

A: He was basically taking the last step and again at that time I didn't know what the landing looked like, or what the porch area looked like, but he looked like he was taking a last leap trying to get into the doorway at the last-you know, just before taking a jumping-trying to jump into the doorway.

Q: Describe his body position in that connection?

A. He had his weapon in his right hand and he was reaching out with his left hand. It appeared to me like he was trying to hold the door open or moving somebody out of the way, and that's the time I shot.

(Horiuchi Testimony at 107–08.) This testimony describes the body position of a running man about to leap onto a porch. At best for Idaho, the testimony calls into doubt the reasonableness of Horiuchi's second shot, which depended on his ability accurately to hit a moving target. But nothing in this testimony contradicts Horiuchi's testimony that he did not know Vicki Weaver was behind the door.

In sum, all the majority offers are suggestions that Horiuchi was careless in firing the second shot. Those arguments go to the reasonableness of Horiuchi's conduct, not to the threshold issue of disputed material facts.

### 6. The Danger of Escape

The majority finally contends that it is at least "in dispute" whether the suspects in the cabin posed any threat of escape. (Majority at 374.) If that issue were in dispute, the majority may be correct in finding a disputed issue of fact. However, it is irrelevant for purposes of this case whether the suspects in fact had an avenue of escape. The only issue, and a somewhat tangential one at that, is whether Horiuchi might have reasonably thought that they did. Again, there are no disputed material facts, only differences about the conclusions to be drawn from those facts.

Horiuchi specifically testified that the cabin was not surrounded. (Horiuchi Testimony at 250–51.) Although Horiuchi could see the back porch of the cabin, he had no way of knowing whether a suspect might escape through a window or other opening on the side of the cabin that he could not see. Horiuchi knew that the suspects had a superior knowledge of the surrounding terrain. There is nothing in the record that suggests Horiuchi could not have concluded that the suspects might be able to escape from the cabin and pose an even greater threat to the other agents if their positions became known. Whether such a conclusion accurately reflected the reality of the cabin is beside the point.[16] Idaho has presented no evidence showing that Horiuchi could not reasonably have thought that the suspects might have escaped from the cabin.

\* \* \*

We now turn to the reasonableness of Horiuchi's conduct under the case law of Supremacy Clause immunity.

### B. The Reasonableness of Horiuchi's Conduct

#### 1. The Ruby Ridge Deployment

Undisputed facts establish the following: Special Agent Lon Horiuchi is a sniper observer in the FBI Hostage Rescue Team stationed in Quantico, Virginia. This team is a highly trained, full-time tactical team whose purpose is to handle sensitive, high-risk law enforcement operations. On August 21, 1992, his group was deployed to Boundary County, Idaho, in response to the shooting death of a Deputy United States Marshal in a mountainous area. When he arrived on the scene, Horiuchi was briefed on the day's events and advised that this mission was extremely dangerous. He was told that federal marshals had been conducting surveillance of the area near the Weaver property when they were attacked by armed men. In the ensuing gunfight, a federal officer was killed. Other federal agents were still believed to be pinned down on the hill. The suspects in the killing of the marshal were Randall Weaver and Kevin Harris, who were alleged to have ties with white separatist groups. Weaver had been eluding arrest on federal weapons charges for more than a year. It appeared that Weaver was an especially dangerous individual. He was known to have had Special Forces training and expertise in weapons, explosives, and military tactics. He always appeared armed and would confront anyone he encountered. He established "fighting positions" around his residence, and armed members of his family would man these "battle stations" to challenge any stranger that approached. Weaver and Harris

---

**16.** The majority chides us for "drawing inferences in favor of Horiuchi." (Majority at 374 n. 24.) If we were stating that the suspects had a clear avenue of escape, the majority's point would be well taken. But we make no such claim. We merely note that Horiuchi could have thought that there was an avenue of escape. This does not require drawing any inferences in his favor. It is a simple statement of fact that is apparent from the record.

were known to be carrying handguns and long guns.

Horiuchi was also told that the FBI had adopted special Rules of Engagement for dealing with the situation. Under the Rules, officers were authorized to employ deadly force against any armed adult male if a shot could be taken without endangering the Weaver children. The Rules of Engagement further alerted Horiuchi to the extreme danger presented to himself and to fellow officers by Weaver and Harris.[17] On the rainy, overcast afternoon of August 22, 1992, Horiuchi and other members of the Hostage Rescue Team took up positions in sight of the cabin, climbing several hours over steep, rocky terrain. However, they did not surround the cabin, and Horiuchi did not know if there were any escape routes from the cabin. Horiuchi's position directly faced the side of the cabin, about 200 yards away. He could see a porch on the front of the cabin. A door led from the cabin to the front porch. When the door was opened outward, perpendicular to the front of the cabin, Horiuchi could see the door. Otherwise, it was not visible.

Shortly before 6 pm, Horiuchi observed an FBI helicopter lift off from the law enforcement base in the valley below the Weaver cabin. A few seconds later, he observed two adult males, at least one of whom was armed, and a young female rush from the cabin to a rock outcropping that had been described as the Weavers' "look-

out." Horiuchi soon observed one of the men point his rifle at the sky, appearing to aim at the FBI helicopter. Horiuchi fired a single shot at the armed male. He believed, erroneously as it turned out, that his shot had missed. The three individuals then took cover behind a structure they termed the "birthing shed."

Seconds later, the three individuals ran toward the cabin. Horiuchi saw the first male and the female run through the door into the cabin. The last male was armed, and Horiuchi believed he was the man who had threatened the helicopter. The male slowed before reaching the door and looked toward the ridge where Horiuchi was located. From the cabin, the male would be able to shoot at the helicopter without risk of the agents returning fire, since the agents had been told not to fire into the cabin.[18]

Horiuchi fired one shot at the armed male before he stepped behind the opened door. The shot went through the door, striking its target, as Horiuchi intended. However, unknown to Horiuchi, Vicki Weaver was standing behind the door, where Horiuchi could not see her. The shot struck her before it hit the armed male. Weaver died immediately. The shot was fired parallel to the front of the cabin,[19] which was the only type of shot Horiuchi could take without firing into the cabin itself. This second shot came ap-

---

17. It is not necessary for us to decide whether these Rules of Engagement were constitutional. Neither Horiuchi nor the United States argues that Horiuchi's conduct can be justified simply by referring to these Rules.

    However, the existence of the Rules cannot be ignored. They play a critical role in explaining Horiuchi's mental state and the level of danger that appeared to him. The fact that the FBI felt such rules were necessary certainly implicates the reasonableness of Horiuchi's conduct in this highly charged situation.

18. At oral argument, the state conceded that, if Harris got into the cabin, he could shoot at the helicopter without risking returning fire.

19. There is no evidence that Horiuchi fired into the cabin or that the bullet entered the cabin. Had the door not been open, the bullet would have landed somewhere on the other side of the cabin.

proximately twenty seconds after the first shot.

## 2. Reasonableness

The standard we apply in determining Horiuchi's entitlement to immunity from state criminal prosecution is perhaps the most deferential standard known to the law. We are not here to assess whether Horiuchi is immune from federal criminal liability or from civil liability. We need not determine whether Horiuchi violated internal regulations or whether he is fit for the position he holds. Our issue is a very narrow one: Did Horiuchi lack an honest and reasonable belief that his actions were necessary and proper in fulfilling his duties? Horiuchi's belief will be reasonable unless *no* reasonable officer could have taken the actions that he did.

Immunity attaches even if an agent's "belief was mistaken or his judgment poor." *McShane*, 235 F.Supp. at 274. If an officer "was acting in the supposed exercise of his duty, without malice or criminal intent ... he is not liable to prosecution in the state court from the fact that from misinformation or lack of good judgment he transcended his authority." *Lipsett*, 156 F. at 71. "Proper application of this standard does not require a petitioner to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Clifton*, 549 F.2d at 728.

As explained in the first part of this opinion, no federal officer has *ever* been denied immunity because a court later second-guessed the reasonableness of his conduct. The only cases in which immunity has been denied are cases in which there is clear evidence of malice or evidence that the officer was not on official duty.

In this case, there is no evidence that Horiuchi was not on official duty at the time of the shooting. There is no evidence that Horiuchi acted with malice.[20] There is no evidence that Horiuchi knew that Vicki Weaver was behind the door. And there is no evidence that Horiuchi did not fear for the safety of other officers when he fired his second shot. All the majority can offer is a string of second-guesses: Horiuchi should have done this. He should not have done that. He should have been more careful. All of this may be true, but none of it will be sufficient to meet the exceptionally high standards imposed by the Supremacy Clause immunity cases. Considered carefully, the majority's arguments amount to little more than assertions that this incident should have been handled differently, a proposition with which no one will disagree.

The majority first suggests that there was no real threat to the helicopter or to the other agents when Horiuchi fired the second shot, and that any fear he may have felt was not objectively reasonable. (Majority at 368–69.) In this case, however, there were plenty of signals indicating a serious threat to the agents and the helicopter. The suspects were known to be armed and extremely dangerous. One federal agent already lay dead. The cabin may have been stockpiled with weapons and explosives. A suspect in the cabin could fire freely into the mountains and into the sky, since the FBI agents could not return fire into the cabin. It did not appear impossible that an armed suspect could escape into the woods and use his superior knowledge of the surrounding terrain to further endanger the lives of the agents and others. The armed male had appeared poised to fire at the FBI helicopter. Nothing about the incident suggested

---

**20.** To the contrary, Idaho has conceded in its indictment that Horiuchi acted *without mal-* *ice.* This is an essential element of its case that it must prove at trial.

that the agents were dealing with normal, peaceful people. Under all those circumstances, Horiuchi made the decision to shoot. Twenty/twenty hindsight may suggest that the decision was erroneous or that Horiuchi exercised poor judgment in making it. But that is not enough. The issue is whether it was so far beyond the bounds of reasonableness at the time that no reasonable agent would have done what Horiuchi did. Idaho has come nowhere close to such a showing.

The majority's second suggestion is that no reasonable officer would have acted as Horiuchi did because he failed to give a warning before firing. (Majority at 372.) The Supreme Court has held that, when an officer has probable cause to believe that a suspect "poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). "[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, *where feasible*, some warning has been given." *Id.* at 11–12, 105 S.Ct. 1694 (emphasis added).

In *Garner*, a police officer fired at a suspect in a residential burglary whom the officer was "reasonably sure" was unarmed. *Id.* at 3, 105 S.Ct. 1694. There was no likelihood of violence, and the officer did not attempt to justify the shooting on any other ground than the need to prevent an escape. *Id.* at 21, 105 S.Ct. 1694. Nonetheless, the officer received qualified immunity in the lower court, and the Supreme Court expressed no disapproval of that immunity. *Id.* at 5, 105 S.Ct. 1694.

In *Forrett v. Richardson*, 112 F.3d 416, 420 (9th Cir.1997), we held that "a suspect need not be armed or pose an immediate threat to the officers or others at the time of the shooting." Because the officers there had "probable cause to believe [that Forrett] had committed a crime involving the infliction of serious harm . . . . [they] therefore had probable cause to believe that Forrett posed a serious threat of harm to them or others." *Id.* We further noted that the evidence did not show that "the police had actually established an *escape-proof* cordon at the time Forrett was shot." *Id.*

In this case, Horiuchi knew that the armed man was wanted on federal weapons charges, that he or a compatriot had already killed a federal agent, and that he appeared to threaten officers in the helicopter with a weapon. Here, Horiuchi reasonably could have thought that a warning would expose fellow agents to danger, and that it would result in a shot immediately being fired in his direction. The prior conduct of the suspects would certainly support such an inference. He also could have concluded that the suspects posed some danger of escape. These may have been mistaken conclusions, and perhaps greater care might have led to a different decision. But *Garner* contemplates that the feasibility determination will be in the hands of the individual officer on the scene. Surely a mistaken conclusion as to the feasibility of a warning by a federal officer does not turn the officer into a common criminal. A reasonable officer in Horiuchi's position could have made this determination, even if in retrospect it may not be justifiable. *Clifton*, 549 F.2d at 728.

The majority next suggests that Horiuchi may not have been certain of his target and that he fired in the "face of major uncertainty about the identity of the tar-

get." (Majority at 373.) This argument rests on an entirely faulty premise. Horiuchi *never* testified, as the majority claims he did (Majority at 373), that he could not distinguish between the two adult males. When the three individuals came out of the cabin, Horiuchi could see that the last one out was carrying a long weapon. (Horiuchi Testimony at 69.) He could not see any weapons on the other two individuals. (*Id.* at 69.) Horiuchi focused his attention on the armed male. (*Id.* at 70.) This individual later appeared to threaten the helicopter, and Horiuchi fired at him. After the shot this individual disappeared behind the "birthing shed." (*Id.* at 99.) The three individuals then came out from behind the shed; they appeared to be in the same order as when they left the cabin. (*Id.* at 99.) Horiuchi saw that the second male was carrying a long weapon and he focused on that individual. (*Id.* at 100–01.) He also testified that he never saw a weapon in the hands of the other male. (*Id.* at 220.) Horiuchi therefore assumed that the armed male he saw disappear behind the shed was the same armed male he saw emerge from behind the shed, and that the unarmed male he saw disappear behind the shed was the same unarmed male he saw emerge from the behind the shed.

Horiuchi, however, was mistaken. The individuals had become confused. When asked on cross-examination how this mistake could have happened, Horiuchi explained, "They appeared to be dressed similar, that individual looked similar to the individual that initially came out as a third person." *Id.* at 238. From this, the majority concludes that Horiuchi fired in the face of known uncertainty about his target. The testimony establishes nothing of the sort. Horiuchi used the presence of the weapon to distinguish between the two individuals. He saw an unarmed man and an armed man. The armed man appeared to threaten the helicopter. Both disappeared, and Horiuchi again saw an armed man and an unarmed man. It is certainly within the bounds of reasonableness to conclude that the armed man was the same person. Perhaps Horiuchi could have exercised more care, but this was a moment of extreme danger and it is impossible to contend that Horiuchi's conduct here was so totally unreasonable that no reasonable agent could have the drawn the conclusion he drew.

The majority finally suggests that Horiuchi could not reasonably have fired his second shot if he knew or should have known that someone was standing behind the door. As we have already explained, there is no evidence that Horiuchi knew someone was standing behind the door. Horiuchi saw the first male and the female run quickly to the porch and disappear behind the open door. (Horiuchi Testimony at 105.) It would not be unreasonable for Horiuchi to conclude that these individuals ran into the cabin and did not linger behind the open door. We also agree with the district court that "it would be objectively reasonable for Mr. Horiuchi to believe that one would not expect a mother to place herself and her baby behind an open door outside the cabin after a shot had been fired and her husband had called out that he had been hit."

Moreover, Idaho's entire criminal complaint rests on Horiuchi's failure to determine "whether any other person other than his intended target was present on the other side of the door." On this point, the present case is indistinguishable from *Lipsett*. In *Lipsett*, a federal agent fired his weapon at a suspect, despite the presence of other people who were apparently on the other side of the suspect. The agent missed, and an innocent bystander was killed. The state contended that it was "possible to discover that [the victim]

and her companions were in the line of fire." 156 F. at 67. The court nevertheless granted immunity, since a "lack of good judgment" does not translate into a forfeiture of immunity. *Id.* at 71. Here, Horiuchi assumed that no else was standing behind the door. His assumption was wrong and may have been based on extremely poor judgment, but it was not so unreasonable as to require the forfeiture of his immunity.

\* \* \*

In sum, there is nothing to place this case into the tiny category of cases in which federal courts have denied Supremacy Clause immunity to federal officers. The facts of this case fit squarely into the long line of cases in which immunity has been granted, despite bad judgment on the part of the officer. We can all agree that what happened at Ruby Ridge was deplorable. Few people would contend that the FBI adopted an appropriate strategy to handle the situation. In hindsight, Horiuchi could have acted more carefully, and he probably made serious mistakes in judgment. It is, however, one very large and unsupported leap to move from that assessment to the conclusion that Horiuchi's conduct was so objectively unreasonable that he must be called to account in a state criminal dock. The Monday-morning quarterback can always perfectly dissect the mistakes of the professional, can always point to decisions erroneously made, and can always show, in retrospect, how things might have been handled better. Our role is not to decide what should have been done, but to determine whether the professional in the field acted within the bounds of permissible authority in executing a quick judgment call in a crisis situation.

As judges, we enjoy absolute immunity for our mistakes of judgment. We do not risk imprisonment for reaching the wrong judgment in this case. Special Agent Horiuchi does. After three rounds of litigation in federal court, thousands of hours of legal work, extensive briefing and oral argument, six judges of this court and two experienced United States District Court judges have concluded that Horiuchi acted reasonably. Six judges of this court apparently feel otherwise. Horiuchi, of course, did not have the option of making a leisurely decision after carefully examining a vast pile of papers on his desk. He had to make his judgment in a matter of seconds on a dark, rainy day on a ridge in Idaho in the aftermath of the slaying of a fellow federal agent. The very fact that a majority of federal judges who have examined Horiuchi's conduct have found his actions reasonable for Supremacy Clause immunity purposes belies the majority's repeated suggestions that *no* reasonable agent might have acted as he did.

The consequences of today's decision extend far beyond potentially sending this FBI agent to trial under Idaho law. The majority contends that this is an exceptional case that could not possibly chill law enforcement efforts in more ordinary circumstances. (Majority at 376–77.) This confidence is not shared by those with lengthy experience in law enforcement. In an amicus brief, four former Attorneys General of the United States and a former Director of the FBI, from different administrations, argue that it is "impossible to imagine a more chilling circumstance" than the attempted prosecution of Agent Horiuchi and that the majority's decision will "severely undermine, if not cripple, the ability of future Attorneys General to rely on specialized units in moments of crisis such as hostage taking and terrorist acts." As the Solicitor General of the United States explained in oral argument, "This case tests a principle of surpassing importance to the United States.... State

prosecution of federal officers is terribly chilling in all but the most extreme cases, and this is not one of them." If Lon Horiuchi were just some rogue agent who took the law into his own hands, as the majority suggests, it is hard to imagine why any of these people would jump to his defense. Their concerns are unlikely to be assuaged by the thought that we can count on the good judgment and discretion of state prosecutors not to interfere unduly with federal law enforcement efforts.

The inevitable result of the majority opinion is that federal agents will hesitate in precisely those highly charged situations in which their quick judgment is most critical to the effective enforcement of our nation's laws. Nothing, it has been said, focuses the mind like the fear of being hanged. The great danger is that federal agents will focus their minds, not on the immediate task at hand, but on the intricacies of state and local law. As one court has recognized in these cases, there is a real risk that the engagement "would be turned into a debating school, where the precious moment for action would be wasted in wordy conflicts between the advocates of conflicting opinions." *Fair*, 100 F. at 154–55 (quoting *McCall v. McDowell*, 15 F. Cas. 1235 (C.C.D.Cal.1867) (No. 8673)).

### Conclusion

Every day in this country, federal agents place their lives in the line of fire to secure the liberties that we all hold dear. There will be times when those agents make mistakes, sudden judgment calls that turn out to be horribly wrong. We seriously delude ourselves if we think we serve the cause of liberty by throwing shackles on those agents and hauling them to the dock of a state criminal court when they make such mistakes, especially when the prosecuting state concedes they acted without malice. None of us on this court,

thankfully, knows what it is like to be engaged in an altercation with armed and dangerous criminals. Special Agent Lon Horiuchi does, as do the thousands of other federal officers who daily risk their lives to protect ours. Today's decision is a grave disservice to all these men and women, who knew until now that if they performed their duties within the bounds of reason and without malice that they would be protected from state prosecution by Supremacy Clause immunity and not subjected to endless judicial second-guessing. The clear mandate of over a hundred years of Supremacy Clause jurisprudence forbids the state of Idaho from prosecuting Horiuchi for his mistaken judgment in this regrettable incident. Because I cannot agree with the majority's attempt to thwart that law, I respectfully dissent.